UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERITAGE GUITAR, INC.,                     Case No. 20-cv-229

      Plaintiff,                            Honorable Hala Y. Jarbou

v.                                         Magistrate Judge Ray Kent

GIBSON BRANDS, INC.,

      Defendant.

---

Gary Mouw (P69236)
VARNUM, LLP
Attorneys for Plaintiff
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI  49504
(616) 336-6000
brwalters@varnumlaw.com

## SECOND AMENDED COMPLAINT[1]

    Plaintiff Heritage Guitars, Inc. ("Heritage"), by its undersigned counsel, brings this action against Defendant Gibson Brands, Inc. ("Gibson") and alleges as follows:

### NATURE OF THE ACTION

    1.    Heritage brings this Second Amended Complaint[2] under federal and state antitrust laws to remedy Gibson's predatory and anticompetitive course of conduct.  As alleged herein, Gibson has baselessly threatened and ultimately pursued sham litigation to cripple Heritage, a unique and fast-growing competitive threat to Gibson's entrenched monopoly position.  For decades, Heritage has been able to offer premium, Made-in-America, classic electric guitars that

---

[1] Heritage's Second Amended Complaint removes its claims that were dismissed by this Court on March 10, 2021.  See ECF No. 57.  Heritage reserves all rights as to the dismissed claims and their removal here shall not be construed as waiver of those claims.

[2] Heritage filed its Amended Complaint only to update certain redactions and this is the first substantive amendment to Heritage's pleadings.

rival the prestige of Gibson's offerings.  In recent years, however, new investment has breathed new life into Heritage, which is now on track to double sales in each of the last two years.  The combination of this history and recent growth has placed a target on Heritage's back.

2.      Gibson's goal is to drive Heritage's H-150 solid-body single-cut electric guitars out of the relevant market that Gibson's Les Paul guitars currently dominate, and to drive Heritage's H-535 semi-hollow-body double-cut electric guitars out of the relevant market that Gibson's ES series guitars currently dominate.  In addition to using litigation as an anticompetitive weapon to dampen the emerging competition from Heritage's classic, 1950's-era electric guitars, Gibson has more recently turned its sights to the key Heritage investor that has invigorated the legendary brand.  Gibson has threatened that investor with long-term, multi-million-dollar injury in a thinly veiled effort to coerce and punish that investor, hoping ultimately to accelerate Heritage's exit from the relevant markets defined below.

3.      Heritage therefore seeks treble damages and injunctive relief from this unlawful monopolistic conduct.  Heritage also continues to pursue its original claims for declaratory and injunctive relief so that it may clear any baseless cloud of illegitimacy Gibson's exclusionary conduct places over Heritage in the marketplace.  The relief sought will allow Heritage to continue what it has been doing for decades—manufacturing and selling premium electric guitars in classic shapes and styles from its traditional Kalamazoo, Michigan lineage.  The declaratory relief sought will also allow Heritage to continue to grow, as it has for the past couple of years, to become one of the first true challengers to Gibson's long-standing monopoly in certain key electric guitar markets.

## BACKGROUND

4.       In the early 1980s, Gibson Brands, Inc. ("Gibson") decided to close its historic 225 Parsons Street factory in Kalamazoo, Michigan.  Some 225 Parsons Street employees did not want to move their homes and families to Tennessee, and in 1985 formed a new company, Heritage Guitars, Inc. ("Heritage"), to carry on the tradition of hand-crafted guitar-making that started at Parsons Street in 1917.  They purchased space at the abandoned factory and bought some old Gibson equipment that was sold at an auction.  Over the ensuing thirty-five years, Heritage has become known as one of the world's foremost guitar manufacturers, focusing on hand-crafted attention to detail and moving away from the cost-cutting techniques that ultimately caused Gibson to close the original factory.

5.       Not surprisingly, there was an early clash between Gibson and Heritage over Gibson's claims to own the "look" of certain guitar designs, and litigation ensued in both federal court and before the U.S. Trademark Trial & Appeal Board.  Ultimately, that litigation was resolved in 1991.  For the ensuing twenty-nine years, Heritage and Gibson went their separate ways, each selling its own well-known guitars into the market, with no problems or issues.

6.       Peace between these companies ended when Gibson went bankrupt and its assets were purchased by a New York-based $150 billion hedge fund, Kolberg Kravis & Roberts ("KKR").  Now Gibson, via KKR, seeks to undo the resolution achieved in 1991 and followed by both parties for twenty-nine years, by claiming phantom breaches of the 1991 settlement by Heritage.  Indeed, Gibson has explicitly threatened to sue Heritage in the United States District Court for the Central District of California, a venue unrelated to either company's businesses in Nashville (Gibson) and Kalamazoo (Heritage), presumably because of a prior unfavorable trademark decision by the United States Court of Appeals for the Sixth Circuit.  Heritage brings

this action to resolve the cloud of fear, uncertainty and doubt that Gibson and KKR seek to cast over Heritage's business by these ill-conceived threats.

7.      More particularly, this action arises out of the settlement agreement that Gibson and Heritage entered into on August 29, 1991 (the "Settlement Agreement") to resolve the trademark dispute then existing between the parties relating to guitar designs.  Under the Settlement Agreement, Heritage agreed to make five specific changes to the design of its guitars at issue, and Gibson agreed that with those changes, Gibson had no intellectual property claim against Heritage.   Heritage, in turn, agreed to drop its opposition to the registration of one of Gibson's alleged trademarks.  The parties further agreed that even future guitar models that were not explicitly approved in the Settlement Agreement would still not infringe any of Gibson's intellectual property rights as long as such designs were not "closer in appearance" to specific examples of Gibson guitars pictured in exhibits to the Settlement Agreement.

8.      Heritage complied with all terms of the Settlement Agreement.  Indeed, ***for nearly twenty-eight years,*** from 1991 to 2019, Gibson never claimed that Heritage failed to meet its obligations under the Settlement Agreement, or that any Heritage guitars infringed Gibson's intellectual property rights.  In February 2019, shortly after KKR took over Gibson, Gibson wrote to Heritage and essentially claimed that Heritage had been violating the Settlement Agreement for decades.  Gibson demanded that Heritage essentially cease its business as the only solution that Gibson would accept.  Heritage pointed out that its designs remained substantially unchanged, and any minor modifications to elements not at issue in the 1991 Settlement Agreement indisputably resulted in the designs being further from Gibson's designs in the Settlement Agreement than the approved models.  Heritage thus confirmed that it

complied in all respects with the Settlement Agreement, and it refused to accede to Gibson's demand that it cease virtually its entire business.

9.     Recognizing the lack of merit in its claims, Gibson fell silent again for the next several months.  In February 20, 2020, however, Gibson wrote to Heritage claiming different alleged violations of the Settlement Agreement, infringement of its intellectual property rights, and threatening to take legal action—indeed, attaching a draft complaint.

10.     Mounting serial, aggressive, meritless legal threats against smaller competitors is Gibson's *modus operandi*.  Gibson has targeted dozens of smaller luthiers with cease-and-desist letters, and many of those cease-and-desist letters concerned products those luthiers had sold for many years.  Those letters were aimed at driving away competition challenging any aspect of Gibson's broad lineup of guitars, including lower-end guitars sold under Gibson's Epiphone brand.  Gibson fired off those threats to intimidate those competitors without any regard for the merits of the factual or legal claims.  And the strategy often worked because, on information and belief, many of those smaller luthiers decided they could not afford a legal battle with Gibson and instead withdrew from competition.

11.     Gibson's challenge against Heritage, while consistent with this *modus operandi*, took on a different intensity.  The reason is that Heritage poses a unique competitive threat to Gibson's highest selling premium lines.  Gibson itself has long recognized "nostalgia" as a key driver of demand for its best-selling models, the Les Paul and ES-335.  And, whether Gibson likes it or not, the reality is Heritage and Gibson do share a common history.  The experience of the luthiers that founded Heritage in Kalamazoo, combined with their commitment to craftsmanship, allows Heritage to offer customers premium guitars with image, prestige, and status that rival Gibson's.  Further, recent investment by BandLab Technologies into the

legendary Heritage brand has allowed it be on track to double sales in each of the last two year. This legacy and recent success pose a significant threat to Gibson's monopoly power.

12.     Gibson's baseless threats of legal action and cease-and-desist demands presented Heritage just two options: (1) cease production of the competitive Heritage products that represent a unique challenge to Gibson's monopoly power, or (2) incur the massive expense to defend costly, baseless claims in court, expenses that will stifle Heritage's growth and threaten its existence.  Both options injure Heritage and injure competition in the marketplace.

13.     None of Gibson's evolving legal theories have merit, and Heritage remains, and has always been, in full compliance with the Settlement Agreement.  Nevertheless, to resolve the uncertainty created by Gibson's threats and allegations, Heritage was left with no choice but to file this action seeking the following relief: (1) a declaratory judgment that Heritage has not breached the Settlement Agreement; (2) a declaratory judgment that Heritage has not infringed, and is not infringing, U.S. Registration No. 1782606 (the "'606 Mark") or U.S. Registration No. 2007277 (the "'277 Mark") (collectively, the "Asserted Trademarks"); and (3) a declaratory judgment that Heritage has not diluted, and is not diluting, the Asserted Marks.

14.     In response, Gibson made good on its threats and filed sham counterclaims alleging breach of contract and trademark infringement, and then broadened its anticompetitive attack by targeting Heritage's key investor.  In light of this relentless and amplified anticompetitive conduct, Heritage adds claims through this Second Amended Complaint for treble damages and other relief from Gibson's flagrant monopolization and/or attempted monopolization pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.773.

## PARTIES

15.     Heritage is a corporation organized and existing under the laws of the state of Michigan, with its principal place of business at 225 Parsons Street, Kalamazoo, Michigan 49007.

16.     Upon information and belief, Gibson is a Delaware corporation with its principal place of business at 309 Plus Park Boulevard, Nashville, Tennessee 37217.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction because this action arises under the trademark laws of the United States, 15 U.S.C. § 1125(a), *et seq.*, as well as the antitrust laws of the United States, 15 U.S.C. §§ 2, 15, 26, and thus presents a federal question (28 U.S.C. § 1331) and one in which exclusive jurisdiction exists in federal court (28 U.S.C. § 1338).  In addition, the Court has diversity and supplemental jurisdiction over the non-federal causes of action asserted pursuant to 28 U.S.C. §§ 1332, 1367.  The amount in controversy exceeds $75,000, exclusive of interests and costs.

18.     This Court has personal jurisdiction over Defendant because Defendant purposefully directed its activities at Heritage, a resident of the state of Michigan, and this Complaint arises out of those activities.  Gibson entered into the Settlement Agreement with Heritage, which imposed enforcement obligations on Heritage in this State.  In addition, Gibson has had multiple communications with Heritage in this State, including cease and desist communications sent to Heritage's facility in Michigan.  Further, as described further below, Gibson has made threats with respect to Heritage's business operations in Michigan.  This Court also has personal jurisdiction over Defendant because it maintains continuous and systematic contacts with the forum such that the exercise of jurisdiction over it would not offend traditional

notions of fair play and substantial justice.  This Court has also personal jurisdiction over Gibson under the Michigan "long-arm" statute, because Gibson is a corporation that carries on a continuous and systematic part of its general business within the State of Michigan.  MCL 600.711(3).

19.     Gibson transacts business within this district and commerce hereinafter described is carried out in substantial part in this district.  Gibson has dealers selling their products in this district and customers may also buy Gibson products directly in this district.  Venue is therefore proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 (b) and (c).

## FACTUAL ALLEGATIONS

### I.      Heritage Guitar, Inc.

20.      Founded in 1985, Heritage is one of the world's premier musical instrument manufacturers.  Heritage sells guitar models from its Standard Collection, Artisan Aged Collection, and Custom Shop Collection.  The Standard Collection includes the H-137, H-150, H-530, H-535, H-575, and the Eagle Classic models.[3]

21.      Heritage was founded to build upon the long legacy of guitar craftsmanship derived from the Kalamazoo factory and for the next 30 years, its co-founders ran the company on those same values.

22.      It is no secret that Heritage's founders previously worked for Gibson, until 1984, when Gibson left Kalamazoo for Nashville, Tennessee.  In fact, Gibson's early days in Nashville were marked by struggles for the brand, as the factory in Nashville lacked the dedicated craftsmen who had long produced Gibson guitars in Kalamazoo.

23.      Heritage guitars received rave reviews for "excellent build quality and superb performance" (guitarplayer.com), as "irresistible" and "truly impressive" ("Guitar World").  As a review of one of its guitars stated, "Heritage gets it spectacularly right where it matters" (guitar.com).  Among other awards, the Heritage H-150 was awarded the coveted Platinum Award for Excellence by Guitar World.

24.      Heritage Standard Collection guitars combine classic design, modern touches, and the finest materials, for an unparalleled quality, style and playability that is sought after by musicians around the world.  Indeed, Heritage guitars have been used and endorsed by numerous

---

[3] Heritage has since discontinued the H-137.

well-known musicians, including Grammy Award winner Kenny Burrell, country musician Roy Clark, jazz guitarist Henry Johnson, and two-time Grammy nominee David Becker.

## II.      The 1991 Settlement Agreement

25.      In 1990, Gibson sued Heritage alleging infringement of certain claimed trademark rights.  *Gibson Guitar Corp. v. Heritage Guitar, Inc. and Lasar Music Corp.*, Civil Action No. 3-90-0009 (M.D. Tenn.) (the "Lawsuit").  In particular, Gibson accused, *inter alia*, Heritage's H-150 series, H-535, H-555, H-575, H-576, Super Eagle, Eagle TDC, and H-357 models.  Heritage denied any alleged infringement.

26.      Images of the accused Heritage models are shown below:



These pictures are from the Settlement Agreement.  The Heritage guitars are shown in Exhibit B of the Settlement Agreement.

27.     On August 29, 1991, Heritage and Gibson entered into the Settlement Agreement to resolve the Lawsuit.

28.     In order to resolve the dispute, and without admitting any liability or the validity of Gibson's assertions, Heritage agreed to make five small design modifications to certain of its guitars: (1) the truss rod covers[4] of all Heritage guitar models; (2) the pickguard[5] of all H-150 series guitars; (3) the horn dimension of all H-150 series guitars; (4) the peghead[6] of its H-357 guitars; and (5) the removal of the switch washer in its H-150CM guitars.  Heritage made each of those changes, and Gibson never disputed that Heritage promptly complied with the Settlement Agreement.

29.     At the time the parties signed the Settlement Agreement, Heritage was selling "single-cut" and "double-cut" guitars.  ***None of the changes requested by Gibson involved any modification to the single-cut or double-cut design of the Heritage guitars.***  Accordingly, Heritage has continued to use single-cut and double-cut guitar designs after 1991, just as it had done beforehand.

30.     In particular, the H-150 Deluxe model (as depicted in Exhibit B to the Settlement Agreement) had a "single-cut" design.

---

[4] A truss rod cover is a plate affixed to the guitar that is designed to cover the truss rod.  The truss rod itself is a rod that runs underneath the fingerboard of the guitar.  On certain guitars, a player may stabilize the curvature of the neck of the guitar by tightening or loosening the rod via a bolt or other mechanism.
[5] A pickguard is a plate typically made of plastic that is attached to the guitar to prevent the guitar's finish from being scratched by the guitar pick during playing.
[6] The peghead is also commonly referred to as the "headstock" of the guitar.  The headstock houses the machine heads of the guitar, which can be turned to tune the instrument.



H-150 Deluxe

Single-cut design

31.     Other Heritage models depicted in the exhibits to the Settlement Agreement having a single-cut design included the American Eagle, Golden Eagle, Super Eagle, Eagle TDC, Eagle, Sweet 16, H-574, H-550, H-575, H-576, H-147, H-140CM, H-150CM, H-157, H-357, Sae Cutaway, and the H-480.

32.     Similarly, the H-535 model (as depicted in Exhibit B to the Settlement Agreement) had a "double-cut" design.



H-535

Double-cut design

33.     Other Heritage models depicted in the exhibits to the Settlement Agreement having a double-cut design included the H-555, STAT, and HB-2 Bass.

34.     Heritage no longer sells all the models depicted on Exhibit B to the Settlement Agreement and instead focuses on the H-150s and H-535s, along with H-530s.  Currently, approximately 50% of Heritage's revenue comes from the sales of the H-150 line. Approximately 35% of Heritage's revenue comes from the sales of the H-535 line. Approximately 7% of Heritage's revenue comes from sales of the H-530.  The remaining revenue comes from lower volume sales of the H-575 and Eagle guitars.

**III.     Gibson Goes Bankrupt**

35.     In May 2018, Gibson filed for Chapter 11 bankruptcy protection with roughly $500 million in debt.

36.     In October 2018, a United States bankruptcy court in Delaware approved Gibson's reorganization plan, which allowed Gibson to exit bankruptcy and keep itself in business.  On November 1, the investment firm Kohlberg Kravis Roberts & Co. assumed majority ownership control of Gibson.

**IV.     Gibson's Cease and Desist Demands**

37.     On February 6, 2019, Gibson sent a letter accusing Heritage of infringing the Asserted Trademarks and breaching the Settlement Agreement.  Gibson demanded that Heritage: (1) immediately cease use of the Asserted Trademarks, or any marks confusingly similar to the Asserted Trademarks; and (2) rescind and refrain from any further advertisements bearing the Asserted Trademarks or any mark confusingly similar to the Asserted Trademarks. In particular, Gibson claimed that Heritage was in breach of the 1991 Settlement Agreement regarding its supposed unauthorized use of Gibson's Les Paul Body Shape Design and ES Body Shape Design.

38.     On May 1, 2019, Heritage responded.  Heritage denied that it infringed upon the Asserted Trademarks or that it breached the Settlement Agreement.  Heritage made the following

13

observations: (1) the H-150 Family Models are readily distinguishable from Gibson's Les Paul design; (2) Heritage was unaware of any actual confusion caused by the H-150 Family Models or the H-535 Family Models; (3) the H-150 Family Models are identical to the body design Gibson approved and gave consent for Heritage to use as far back as 1991; (4) the Settlement Agreement permitted Heritage to sell the H-535 Family Models with approved modifications to the truss rod cover, with which Heritage had complied; and (5) the Settlement Agreement expressly prohibited Gibson from commencing legal action against Heritage based on Heritage's use or sale of such "approved, modified guitars."

39.     Ignoring Heritage's common-sense interpretation of the Settlement Agreement, on May 24, 2019 Gibson sent a response letter that doubled down on Gibson's misinterpretation of the Settlement Agreement. Each one of the claims in this letter was a demonstrably false and objectively baseless interpretation of the Settlement Agreement.

40.     Gibson began with the untenable claim that the Settlement Agreement required Heritage to discontinue its H-150s and its H-535s and, therefore, Heritage violated the Settlement Agreement and infringed Gibson's Asserted Trademarks by selling them. This claim is baseless as the Settlement Agreement expressly permitted the continued sale of all such guitars so long as they contained the minor modifications prescribed by the Settlement Agreement, which the H-150s and H-535s undeniably do.

41.     Gibson then advanced the equally untenable argument that *any change to any guitar* however minor and however unrelated to Gibson's Asserted Trademarks and designs shown in the Settlement Agreement constituted a breach, even though the Settlement Agreement plainly said that only such changes that bring Heritage's guitars "closer in appearance" to specific examples of Gibson's Asserted Trademarks pictured in Exhibit A to the Settlement

Agreement constituted a breach.  Tellingly, Gibson did not acknowledge that language in its May 24, 2019 letter, and instead listed a series of incidental changes to hardware on the guitar—pickups, truss rod covers, and pickguards—on discrete Heritage models that, if anything, had the effect of rendering the Heritage guitar *less like* the Gibson products pictured in Exhibit A to the Settlement Agreement (*see infra*).

42.     Furthermore, Gibson did not, and has never, identified any change to Heritage's H-150s that even purportedly violated the Settlement Agreement.  Nevertheless, Gibson demanded all those guitars (as well as the H-535s) be immediately withdrawn from the market.

43.     Not only did Gibson allege baseless violations of the Settlement Agreement and infringement of Gibson's Asserted Trademarks, it expressly threatened legal action, attaching a Northern District of California complaint.  It stated that it "w[ould] not allow the current H-150 Family Models and H-535 Family Models to continue to be advertised and sold ***without authorization from Gibson***."  The message was clear—Heritage had to surrender its business to Gibson or face legal action in the form of a trademark lawsuit.

44.     Heritage did not respond to these threats.  The design of the H-150s and H-535s had remained unchanged for decades and Gibson's shifting theories of trademark liability and breach of contract were objectively baseless.

45.     Shortly thereafter, Heritage and Gibson had a telephone meeting to discuss Gibson's allegations and Heritage's response.  At this meeting, among other things, Gibson demanded that Heritage cease sale of most of its guitars—essentially, Gibson sought to put Heritage out of business—and threatened to outspend Heritage if it did not accept Gibson's demands.  In spite of Gibson's threats, Heritage refused, citing the Settlement Agreement.

46.     Apparently recognizing the weakness of its claims, Gibson dropped the matter and Heritage heard nothing further for months.

47.     In November 2019, Gibson contacted Heritage, ostensibly to discuss a proposed collaboration relating to the redevelopment of the 225 Parsons Street building. However, Gibson conditioned its participation in the project on cessation of operations by Heritage.  When Heritage again refused, Gibson responded that it would be sending a cease and desist letter.

48.     On February 20, 2020, Gibson wrote to Heritage, again accusing Heritage of infringing the Asserted Trademarks.  Gibson threatened imminent litigation, including a draft complaint.

49.     Gibson's February 20 Letter claims that the design of four Heritage guitars infringes the Asserted Trademarks and violates the terms of the Settlement Agreement. Specifically, Gibson claims that: (1) the Settlement Agreement only gives Heritage the right to use the exact representation of the single-cut horn, peghead, and truss rod cover expressly approved in Paragraph 7 of the Settlement Agreement; and (2) Heritage is not allowed to modify its single-cut design outside of the exact representation shown in Paragraph 7.  However, each of these designs was explicitly permitted under Paragraphs 4, 6, 7(a), and 7(b) of the Settlement Agreement.

50.     First, Gibson's February 20 Letter claims that the design of the four Heritage guitars "infringe on Gibson's Les Paul Body Shape Design Trademark and Gibson's ES Body Shape Design Trademark."  However, as shown in Exhibit B to the Settlement Agreement, prior to the time of settlement, Heritage sold many guitars that included single-cut and double-cut body design.  The Settlement Agreement does not require any change to the body design, and indeed Heritage's single-cut and double-cut body designs also have been continuously used in

the twenty-nine years since the Settlement Agreement was signed, with no objection from Gibson until last year.

51.     Second, Gibson claimed that only complete designs of hardware depicted in the Settlement Agreement, with the five approved modifications discussed in Paragraph 18 above, are permissible.  But all of the Heritage guitars referenced in the Settlement Agreement include the required modifications.

52.     Third, Gibson contends that by making changes to the design of some of its guitars, Heritage has violated Paragraph 7(a) of the Settlement Agreement.  In particular, Gibson further asserts that "Heritage's current single-cuts are not compliant as they incorporate P-90 pickups and are sold without a pickguard."  Gibson's assertions are wrong for at least three reasons.

53.     First, Paragraph 7(b) of the Settlement Agreement allows for other guitars or changes not covered by Paragraph 7(a), as long as the design is not "closer in appearance" to Gibson's designs and guitar-related designs shown in Exhibits A1 through A7 of the Settlement Agreement. Gibson's designs and guitar-related designs shown in Exhibits A4 through A7 all show Gibson guitars with Humbucker pickups. Those Gibson designs are depicted here:

   

54.     Only two Heritage guitar models identified in Gibson's February 20 Letter use P-90 pickups, and both are branded P-90 pickups made by a well-known manufacturer other than Gibson.  Specifically, the Heritage H-137 and H-530 guitars use P-90 pickups branded by Lollar.  As noted on Lollar's website, Jason Lollar has "designed and built some of the most sought-after pickups for electric guitar."  Indeed, Jason Lollar literally wrote the book on pickups, *Basic Pickup Winding and Complete Guide to Making Your Own Pickup Winder*, now in its third edition.  As a matter of law and common sense, it defies reality to suggest that changing these two Heritage's guitars to remove Humbucker pickups (used by Gibson as shown in Exhibits A4 through A7 depicted above), and to replace them with P90 pickups (not used by any Gibson guitar shown in Exhibits A4 through A7 depicted above), can somehow make Heritage's guitars "closer in appearance" to the Gibson guitars.  Accordingly, there is no basis to claim a breach of the Settlement Agreement or a violation of Gibson's intellectual property rights based on Heritage's substitution of P-90 pickups for Humbucker pickups.

55.     Third, Gibson's February 20 Letter misidentifies the Heritage models which it compares on page 3 of its Letter, and suggests that the guitars are the same:



They are not the same guitar.  The image on the left is the Heritage H-147.  The only change required by the Settlement Agreement to the H-147 was to modify the Truss Rod Cover, which Heritage did many years ago.  The picture on the right is the Heritage H-137.  Contrary to

Gibson's Letter, the H-137—introduced by Heritage in 2009, more than ten years ago – has never had a pickguard, nor does the Settlement Agreement require it to add one.  As noted above, the H-137 has always had Lollar P-90 pickups, which are different from the Humbuckers used by Gibson and thus render the design more different from Gibson's designs and guitar-related designs shown in Exhibits A1 through A7 of the Settlement Agreement.

56.     In sum, contrary to Gibson's assertions, Heritage remains fully compliant with the Settlement Agreement, and accordingly, Heritage is not infringing any Gibson intellectual property rights.

57.     Each of Gibson's arguments claiming breach of the Settlement Agreement and infringement of Gibson's Asserted Trademarks advanced in their letters was objectively baseless. No reasonable litigant could have realistically expected success on the merits if Gibson asserted those claims in court.  In particular, no reasonable litigant could realistically expect that a fact finder would conclude that the minor modifications to discrete products cited in Gibson's February 20, 2020 letter breached the Settlement Agreement.  Gibson coupled these baseless claims with explicit threats that it intended to use litigation costs as a weapon.

58.     Gibson's repeated threats and shifting legal theories left Heritage with no choice but to file the instant suit for declaratory relief.  Given Gibson's well-known *modus operandi* and its aggressive posture toward Heritage, it was apparent that litigation was inevitable unless Heritage withdrew at least most of its products from the marketplace, which would be the end of Heritage.  Litigation on Gibson's terms would further be in an inconvenient forum (Northern District of California) having no connection to the dispute or the parties, a tactic by Gibson both to increase costs to Heritage and also to avoid problematic precedent in the Sixth Circuit (which had previously rejected an attempt to enforce Gibson's Les Paul mark on another company).

Indeed, in March 2021, the Court agreed that Heritage's action could go forward, finding that Gibson's multiple cease-and-desist letters meant it was "perfectly reasonable for Heritage to assume that Gibson would file suit." ECF No. 57, MTD Op. at 7.

**V.    Gibson's Sham Litigation Against Heritage**

59.    Gibson knows Heritage has not breached the Settlement Agreement. Despite threatening suit in the Northern District of California, Gibson ultimately pursued its sham claims in this District by way of counterclaims, to use the litigation process itself as an anticompetitive weapon to cripple Heritage.

60.    Gibson counterclaimed seeking to enjoin the sale of at least Heritage's H-150s, H-530s, the H-535s, the H-137 (see Counterclaims, Exhibit E), and claims that an image on an old smokestack and language in Heritage's website also constitute misappropriation. Each of their counterclaims is objectively baseless. No reasonable litigant could realistically expect success on the merits of any them. That said, Gibson's baseless challenges to the H-150s and the H-535s are alone exclusionary given the importance of those guitars to Heritage's survival as a going concern. Those demands compel Heritage to litigate because it cannot afford to discontinue either of those popular models to avoid litigation.

**1.    Gibson's Conclusory Allegations of Breach in the Counterclaims Are Objectively Baseless**

61.    Gibson's counterclaims misleadingly describe the Settlement Agreement as no more than an agreed-upon permanent injunction "throughout the world from using without authorization Gibson's ES Body Shape Design® and Les Paul Body Shape Design®." (Counterclaims ¶ 21). Yet the Settlement Agreement expressly permits a catalogue of guitars, requiring only minor changes, and allowing other changes in the future (so long as those other changes do not make the authorized guitars "closer in appearance" to various images in Exhibit

20

A to the Settlement Agreement). The Settlement Agreement, in fact, expressly prohibits Gibson from challenging authorized guitars (including those pictured as modified) as infringing any of Gibson's Asserted Trademarks. The Settlement Agreement therefore ***preserves competition*** from Heritage; it does not enjoin it, let alone permanently enjoin it. The omission of these core elements of the Settlement Agreement in Gibson's counterclaims set up the baseless claims that follow.

62.     Apart from certain modest design changes, the Settlement Agreement specifically preserves competition from Heritage's H-150s and the H-535s (and others). Those guitars depicted in Exhibit B of the Settlement Agreement, as modified pursuant to Sections 4-7(a) of the Settlement Agreement, are authorized. Gibson has never contended that the required changes in Sections 4-7(a) were not implemented. Thus, whether or not Gibson now believes that the H-150s embody the Les Paul Body Shape Design is irrelevant because those H-150s are expressly authorized by the Settlement Agreement. Similarly, whether or not Gibson now believes that the H-535s embody the ES Body Shape Design is irrelevant because those H-535s are authorized by the Settlement Agreement.

63.     Gibson's allegation that Heritage breached the Settlement Agreement (Counterclaims ¶ 22) is objectively baseless. The Counterclaims themselves do not even explain what action Heritage took that constituted a breach, let alone a material breach. The only allegation is that "Heritage offers for sale, sells, and distributes electric guitars in the United States using Gibson's Les Paul Body Shape Design Trademark and ES Body Shape Design Trademark ("Heritages Unauthorized Products") through its business catalogs, distributors, and its websites at www.heritageguitars.com." (Counterclaims ¶ 25). That allegation is meaningless because if those guitars are compliant with the terms of the Settlement Agreement, there is no

breach.  And tellingly Gibson offers no allegation stating why those guitars are non-compliant.
Nor could it.

64.     No reasonable litigant could realistically expect a fact finder to conclude that
Heritage breached the Settlement Agreement on that non-existent basis.

### 2.     Gibson's Claims Regarding Changes to the H-530 and H-535 Are Objectively Baseless

65.     Turning to the pre-suit allegations included in Gibson's cease-and-desist letters,
Gibson advanced shifting theories of breach including that: (1) the Settlement Agreement did not
permit Heritage to sell any double-cut guitars (including the H-535 or the H-530); (2) the truss
rod cover on the current H-535 is "wider and the top corners are sharper than the approved Truss
Rod Cover in the 1991 Settlement Agreement," (3) the current H-530 guitars have P-90 pickups
whereas Exhibit B shows humbuckers, (4) the current H-530 models have a tailpiece whereas no
tailpiece is present in Exhibit B, and (5) the pick guards on the current H-535 model are different
than Exhibit B and no pick guard is present on the current H-530 model.[7]  None of these
assertions provide any colorable basis for claiming breach, and no reasonable litigant could
realistically expect a fact finder to find breach based on these arguments.

66.     No reasonable litigant could realistically expect to succeed in showing that the
Settlement Agreement did not authorize *any* double-cut guitars.  The Settlement Agreement
authorizes Heritage to continue to make all of its "production model guitars" with specified
changes, and with no other changes that would make it "closer in appearance to Gibson's
registered and unregistered trademarks shown in Exhibit A-1 through A-7."  (See ¶ 7).
"Production model guitars" is defined to include "*all* guitars depicted or described in any
Heritage brochures or advertising."  (See ¶ 1(c) (emphasis added)).  The "Modified Guitars"—

---

[7] Heritage addressed above the baselessness of the claimed changes to the H-137/H-147 guitars, see supra ¶ 54.

i.e., those expressly permitted—is defined to mean "the current HERITAGE production model guitars and stringed instruments *depicted in Exhibit B* but—modified in accordance with paragraph 7."  (See ¶ (b) (emphasis added)).  Exhibit B is a Heritage product brochure containing pictures and descriptions of Heritage's line of guitars.  As Gibson itself acknowledges, the H-535 and several other double-cut guitars are included in Exhibit B, and therefore they are expressly authorized by the Settlement Agreement.

67.     Next, Gibson's identification of certain variances to the guitars in Exhibit B provides no sound basis for the counterclaims.  No reasonable litigant could realistically expect a fact finder to conclude that those changes render the H-535 and H-530 (the only guitars implicated by the alleged variances) "closer in appearance to Gibson's registered and unregistered trademarks shown in Exhibits A-1 through A-7."  At no point has Gibson ever explained, before suit or during, why those changes made the Heritage guitars closer in appearance.  Indeed, Gibson has yet even to contend that those changes do.

68.     For example, Gibson claimed that the pick guard on the H-530 depicted in Exhibit B is no longer present on the H-530 Heritage now sells.  However, Exhibit A-4 (the Gibson double-cut guitar) contains a pick guard.  Pick guards are removeable hardware on a guitar and have no impact on the shape of the guitar.  No reasonable litigant could realistically expect a fact finder to conclude that *removing* a piece such as a pick guard from the H-530 that is present on the Gibson guitar in Exhibit A to the Settlement Agreement makes the Heritage model "*closer in appearance*" to the Gibson products depicted in Exhibit A to the Settlement Agreement, and therefore no reasonable litigant could realistically expect success in claiming that this purported change breached the Settlement Agreement.

69.     Similarly, Gibson claimed that the H-530's were changed to incorporate P-90 pickups instead of humbuckers.  But Exhibit A-4 (the Gibson double-cut) contains humbuckers, not P-90 pickups.  No reasonable litigant could realistically expect a fact finder to conclude switching from humbuckers (which are present on the Gibson model) to P-90 pickups (which are not present on the Gibson model) made the H-530 "*closer in appearance*" to the Gibson products depicted in Exhibit A to the Settlement Agreement, and therefore no reasonable litigant could realistically expect success in claiming that this purported change breached the Settlement Agreement.

70.     Likewise, Gibson's reference to minor changes in certain dimensions of the straight-edged truss rod covers on the H-535 similar provides no grounds to claim breach.  A-1 and A-2 (the trademarked truss rod covers) are curved and bell-shaped, respectively, not straight-edged as on the current H-535.  No reasonable litigant could realistically expect a fact finder to conclude that this purported change made the H-535 "*closer in appearance*" to the Gibson products depicted in Exhibit A to the Settlement Agreement, and therefore no reasonable litigant could realistically expect success in claiming that this purported change breached the Settlement Agreement.

71.     Gibson claims that the pick guard on current H-535s differs in shape from the pick guard on the H-535s in Exhibit B.  The pick guard currently used however is nearly identical to several pick guards shown for related guitars in Exhibit B, and Gibson never requested those pick guards be modified.  The only pick guard modifications required by the Settlement Agreement were for the H-150.  Indeed, the pick guard for the H-535s now is, if anything, closer to the authorized pick guard for the H-150.  No reasonable litigant could realistically expect a fact finder to conclude that the pick guard on the H-535 (with its pointed

top) makes the Heritage model "*closer in appearance*" to the Gibson product depicted in Exhibit A to the Settlement Agreement (with a rounded top), and therefore no reasonable litigant could realistically expect success in claiming that this purported change breached the Settlement Agreement.

72.     Finally, Gibson claims that the H-530 now contains a tailpiece (referencing the trapeze tailpiece on the H-530s) but, again, Exhibit A-4 (the double-cut Gibson guitar) contained no such tailpiece.  No reasonable litigant could realistically expect a fact finder to conclude that adding a tailpiece made the H-530 "*closer in appearance*" to the Gibson product depicted in Exhibit A to the Settlement Agreement that lacks a trapeze tailpiece, and therefore no reasonable litigant could realistically expect success in claiming that this purported change breached the Settlement Agreement.

73.     Finally, any suggestion by Gibson that the guitars Heritage makes must be ***completely unchanged*** for eternity is also objectively baseless.  As an initial matter, as explained above, that position conflicts with the plain language of the Settlement Agreement.  Section 7(b) states that Gibson may challenge guitars as violating the Settlement Agreement only if they "do[] not comply with the approved designs" ***and*** are "closer in appearance to Gibson's registered and unregistered trademarks shown in Exhibits A-1 through A-7 of the Agreement."  That second requirement not only makes common sense; it is also essential.  It would be anticompetitive for Gibson to prevent a change to its rival's product ***unless*** Gibson relied on some intellectual property—here its alleged trademarks depicted in Exhibits A-1 through A-7 of the Agreement.  And, as set forth above, Gibson has never claimed—nor could it ever claim—trademark rights in any of the modest changes to removable items of the guitars described above.

**3.      Gibson's Demand that Heritage Cease and Desist Its Sale of H-150s Is Objectively Baseless**

74.     Gibson has never once alleged that the H-150 (Heritage's highest selling guitar by volume and revenue) includes any material deviations from the Settlement Agreement.  And yet Gibson demanded that Heritage cease and desist selling any H-150s and sought an injunction against those sales.  This demand and request for relief are also objectively baseless.

75.     As part of the Settlement Agreement, the parties agreed to a Consent Agreement to end their then-current litigation.  That Consent Agreement outlined in the Settlement Agreement makes clear that "The parties believe that Heritage's manufacture and sale of its H-150 series guitars in accordance with the terms of the Settlement Agreement and with the distinguishing features provided in the Settlement Agreement *is not likely to cause confusion, mistake or deception among purchasers or others*."  Settlement Agreement, Exhibit E, Consent Agreement at ¶ 4.

76.     Because Heritage has complied with the terms of the Settlement Agreement and has produced H-150s in accordance with its terms since 1991—and indeed, Gibson has never claimed otherwise—Gibson's counterclaims for trademark infringement with respect to the H-150s are objectively baseless.  Particularly given Gibson's binding admission in the Consent Decree, and because there have been no material deviations from the H-150 depicted in Exhibit B of the Settlement Agreement, no reasonable litigant could realistically expect success enjoining the sale of the H-150s.

77.     Even if one or all of the alleged changes to the H-530s and H-535s could constitute a breach (which they cannot), Gibson's demand that Heritage essentially withdraw all products (including its best-selling H-150s) and its request for an injunction demanding the same are objectively baseless.  The express terms of the Settlement Agreement permit Gibson to

challenge *only deviations* and, if necessary, to compel changes (or withdrawal of) those deviated

products—not to act to curtail or destroy competition under that agreement.

78.     Specifically, the agreement provides that "Gibson agrees that it will not

commence any legal action or proceeding asserting that the Modified Guitars [i.e., those

permitted by the Settlement] violate any of Gibson's trademarks."  (See ¶ 6).  It continues that

"*any production model guitar manufactured by Heritage which violates paragraph 4* … shall

be subject to being challenged by Gibson as a violation of this Agreement."  (See ¶ 7(b)

(emphasis added)).  Accordingly, only guitars that violate the agreement may be challenged.

Even accepting Gibson's baseless claims against the H-530s and H-535s, Gibson's challenge to

the H-150s violates the agreement.

79.     Furthermore, the Settlement Agreement resulted in resolution of claims by both

Gibson *and Heritage*—including Heritage's ongoing challenge to the registration of Gibson's

Les Paul body shape trademark.  At the time of the Settlement Agreement, Gibson had no

registered trademark on the Les Paul body shape.  In return for Heritage dismissing its challenge

to that registration, Gibson agreed to the competition permitted by the Settlement Agreement,

including without limitation Heritage's H-150s.  Having obtained for itself the benefit of the

bargain, Gibson cannot now turn around and attempt to foreclose that very competition, using—

in part—the very same registered trademark

### 4.     Gibson's Other Misappropriation Allegations Are Objectively Baseless

80.     The remainder of Gibson's counterclaims illustrate the empty nature of Gibson's

legal threats.

81.     Gibson alleges that Heritage "has also misled the public into believing that it was

affiliated with Gibson" because there is a smokestack on building housing Heritage's factory at

225 Parsons Street that bears the name "Gibson."  (Counterclaims ¶ 66).  Gibson knows that Heritage did not put Gibson's name on that smokestack; Gibson did.  Gibson then abandoned the factory, with the smokestack, when it moved to Nashville in 1984.  Gibson subsequently sold the factory *with that smokestack* to another buyer.  Heritage thereafter began renting space from that subsequent owner, crafting guitars in the factory with Gibson's full knowledge.  Gibson raised no objection to the smokestack for the 35 years since.  Indeed, the smokestack was standing at the time of the 1991 Settlement Agreement and Gibson never then claimed it constituted unfair competition or misappropriation.  As a mere tenant in 225 Parsons Street, Heritage has no ability to alter the exterior of the building, including the smokestack, and Gibson knows that.  Perhaps what is most egregious about Gibson's baseless counterclaim, however, is that the smokestack in question no longer exists.  It had fallen into disrepair and was dismantled (by the owner of the building, not Heritage) several years ago.

82.     Gibson also claims that Heritage is trying to associate itself with Gibson through its website's reference to Orville Gibson.  Counterclaims ¶ 66.  This again is demonstrably false. No reasonable litigant could realistically expect a fact finder would conclude that the historical reference to Orville Gibson's mandolin creation in any way is trying to associate Heritage with the Gibson brand.  Rather, Heritage appropriately references its history, which accurately includes the fact that the brand was started by former Gibson employees and that those employees continued the long tradition of guitar-making at 225 Parsons Street after Gibson abandoned Kalamazoo for Nashville.

83.     Gibson features the website's reference to Orville Gibson but ignores that the next sentence made clear Gibson's departure in 1984, and that the following sentence makes clear that former employees purchased space at the factory in 1985 and "with that, Heritage Guitars was

born."  Tellingly, Gibson's screenshot of Heritage's website (Counterclaims, Exhibit E) omits

the latter statements.  No reasonable litigant could realistically expect success on the merits of

Gibson's website claims.

84.     Indeed, every threat made by Gibson, and now every counterclaim raised, has

been made with the intent to force Heritage to stop competing with Gibson and to allow Gibson

to further entrench its monopoly power in the relevant markets.

## VI.     Predatory Litigation And Threats of Litigation Are Gibson's *Modus Operandi*

85.     Gibson has a long history of litigiousness, especially when it comes to pursuing

rivals with claims of trademark infringement.  Gibson regularly sends cease-and-desist letters to

manufacturers and luthiers that sell guitars that "look like" Gibson models.  Gibson does so

without regard to the merits of any claim it asserts, often with no basis to claim customer

confusion of any kind.  Indeed, a 2004 decision from the Sixth Circuit rejected similar trademark

infringement claims Gibson previously asserted against Paul Reed Smith for failure to

demonstrate customer confusion.[8]  In that case, Gibson's own expert admitted the sophisticated

buyers who would purchase Gibson's guitars would not be confused into thinking they were

buying a Gibson, especially when the other guitar is branded with a different name.

86.     Nevertheless, Gibson continued to send cease-and-desist letters for the purpose of

intimidating competition without regard for whether those luthiers and manufacturers ever

confused any purchasers into believing they were buying a Gibson guitar.  And the tactic often

worked.  For example, in 2015, on information and belief, Tom Anderson pulled its "Bulldog"

—a solid-body, single cut electric guitar—following a series of threats because it could not

afford inevitable litigation with Gibson.

---

[8] *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 553 (6th Cir. 2005).

87.     After Gibson emerged from bankruptcy in late 2018, it reengaged its strategy of using predatory threats of litigation against other guitar makers in an attempt to foreclose competition across a number of guitar submarkets.  In the spring of 2019, on the heels of its threatening letters to Heritage, Gibson embarked on its "Play Authentic" campaign, beginning with a widely viewed YouTube video.  The video was intended to send a message to guitar makers that Gibson intended to step up its attacks.

88.     In this video, Gibson's Director of Brand Experience, Mark Agnesi, begins by featuring the Les Paul (what he calls "the big daddy of them all") and the ES series (as well as others).  He complains first of "forgeries and counterfeit guitars"—imports of lower craftsmanship that are *misbranded* as Gibson guitars.  But then Agnesi misleadingly contends that *any* guitar of a similar shape—even if not in any way branded as a Gibson—is "in fact by definition a counterfeit Gibson guitar."  He then ominously turns to "manufacturers out there," and states, "We want you to know that you've been warned."  Agnesi then encourages consumers to "be original" and "play authentic"—i.e., not buy any other brand's guitar of a similar shape because it is "by definition" an unlawful "counterfeit."

89.     Gibson's assertions in the "Play Authentic" video were false and misleading.  The Heritage guitars, for example, are not "counterfeit Gibson guitars."  They are lawful, and authorized, competition.  The "Play Authentic" video and related marketing aimed to place an unlawful cloud of illegitimacy over Heritage's products and the products of other luthiers.

90.     Gibson knows that throwing around allegations of "counterfeiting" not only misleads consumers about the nature of its competitors' guitars, but also directly hinders competition by casting a cloud of illegitimacy over entire brands.  Such baseless and harmful threats are particularly egregious because Gibson knows that similarly shaped guitars cannot, as

a matter of law, be counterfeits of its products where they are marked prominently with the accused brand's trademark or logo.  Indeed, the Central District of California found just that in 2016.[9]  Yet even this clear ruling did not stop Gibson from recklessly accusing its competitors of "counterfeiting".

91.     More importantly, the "Play Authentic" video previewed a stepped-up predatory campaign.  After the National Association of Music Merchants ("NAMM") show in 2019, Gibson sent upwards of fifty cease-and-desist letters to companies, alleging violations of their trademarks.  Upon information and belief, such letters were sent after Gibson's legal counsel sent representatives to NAMM to take photos of competitors' booths.

92.     In June 2019, Gibson sent letters to its dealers and distributors as well.  In these letters, Gibson stressed that it "intended to take back control" of Gibson's body shape designs. Gibson then implored its dealers to report any instances of "counterfeit or infringing instruments" to Gibson via a website set up for that very purpose.  Particularly when viewed in conjunction with the "Play Authentic" campaign described above, it is apparent that Gibson was pressuring its dealers not to buy legitimate, competitive products like those sold by Heritage.

93.     Upon information and belief, a number of small guitar makers have ceased selling their products in response to Gibson's threats and cease-and-desist letters over the past few years, because they cannot afford to litigate against Gibson.  Accordingly, based on Gibson's concerted conduct and threats, its dominant market share (alleged below) is likely to grow or be maintained even apart from the instant litigation.  Smaller players who cannot defend themselves will simply give up instead of facing the cost of litigating against Gibson.

---

[9] *Gibson Brands, Inc. v. John Hornby Skewes & Co,* 2016 U.S. Dist. LEXIS 179977, *20 (N.D. Cal., 2016) ("no rational jury could find that a particular body shape or headstock stamped with a different guitar brand is a counterfeit of a Gibson trademark").

## VII.    Gibson Targets Heritage's Key Investor

94.     In addition to baseless threats and sham litigation aimed at foreclosing Heritage's

growth and ultimately driving Heritage out of business so that Gibson can insulate its monopoly

power, Gibson's predatory campaign against Heritage has included targeting one of Heritage's

investors to punish that investor and pressure Heritage out of the market.

95.     BandLab Technologies ("BLT") is a part owner of Heritage.  BLT was

established in 2016 and is headquartered in Singapore.  BLT is part of a family of music brands

that span digital, media, manufacturing, distribution, and retail.  Another member of that family

of brands is Swee Lee Holdings Pte Ltd. ("Swee Lee"), a Singapore-based multi-brand musical

instrument and equipment distribution and retail platform that principally services Singapore,

Malaysia, Indonesia, and Vietnam.  BLT and Swee Lee share common ownership.

96.     Swee Lee first gained distribution rights for Gibson products in Singapore over 50

years ago and has since grown to represent the brand in Malaysia, Indonesia, and Vietnam.  In

September 2019, Gibson and Swee Lee entered into their current distribution agreement (the

"2019 Distribution Agreement").  Pursuant to the 2019 Distribution Agreement, Swee Lee

distributes "Gibson Musical Instruments" (including guitars) in Singapore, Malaysia, Indonesia,

Vietnam, Brunei, and Myanmar, and distributes "Gibson Pro Audio" equipment (including

amplifiers) in Singapore and Malaysia.

97.     The ongoing relationship between Gibson and Swee Lee has been enormously

profitable for Gibson.  Swee Lee is a leading distributor in Southeast Asia, especially in

Singapore.  Distribution of Gibson products through Swee Lee has increased significantly since

Swee Lee was acquired by Swee Lee and BLT's common owner.  Last year, sales by Swee Lee

of Gibson products increased by over 30% year-over-year.

32

98.     When Heritage refused to accede to Gibson's baseless demands, which would have amounted to a death sentence for the company, Gibson threatened BLT's ownership, claiming Gibson would reconsider other areas in which the company does business.  Those were not idle threats.  Frustrated that Heritage insisted on competing fairly in the United States pursuant to the 1991 Settlement Agreement, Gibson management sought to advance its anticompetitive goals by targeting BLT's ownership by going after a sister company, Swee Lee.

99.     In January 2021, Gibson acquired the Mesa/Boogie brand of amplifiers.  Swee Lee submitted a proposal to distribute Mesa/Boogie in Swee Lee's core territories: Singapore, Malaysia, Indonesia, and Vietnam.  In April, Gibson's representative in Asia recommended to Gibson management that it transition distribution in Malaysia and Indonesia from the current distributor of Mesa/Boogie amplifiers to Swee Lee, and that Gibson use Swee Lee to enter Singapore and Vietnam, new territories for which there had not previously been a Mesa/Boogie distributor.  Gibson's representative in Asia made that recommendation because Swee Lee was the best option for Gibson, and because Swee Lee had been a strong and successful distribution partner for Gibson in those markets for many years.

100.    Gibson management, however, rejected the proposal despite the recommendation from Gibson's representative in Asia.  On information and belief, Gibson's management decided to punish Swee Lee to coerce the shared owner of Swee Lee and BLT to exit Heritage from the relevant markets in the United States.  The message was clear: if Heritage continued to insist on competing in the United States, Gibson would refuse to deal with other BLT-associated companies, costing those other companies millions in revenue.  Gibson's representative in Asia confirmed to Swee Lee that the decision by Gibson management was not based on Swee Lee's capabilities or past performance.

101.     Instead of pursuing a profitable distribution relationship with Swee Lee in four

key Southeast Asian markets, Gibson decided (1) not to obtain distribution for Mesa/Boogie in

Singapore and Vietnam, and (2) to exit Indonesia (where another company had previously

distributed Mesa/Boogie amplifiers).  In addition, Swee Lee requested that Gibson at least sell

Mesa/Boogie amplifiers to them at higher dealer prices (instead of more favorable distributor

pricing) to meet confirmed pre-orders from customers, but Gibson declined even that.  The

decision by Gibson management—contrary to the recommendation of its regional

representatives—made no economic sense other than as a means to advance its anticompetitive

scheme to monopolize the relevant markets.  The short-term profit sacrifice associated with

deferring distribution through a leading distributor in the Southeast Asian region was in service

to Gibson's greater goal of monopolizing the relevant markets in the United States.

102.     On May 24, 2021, Gibson doubled down.  It provided notice of termination of

Swee Lee's entire rights to distribute Gibson products, acknowledging that it was terminating

"without cause," and providing the 60-days' notice of termination required by the 2019

Distribution Agreement.  The termination will bring to an end the long-standing prior profitable

course of dealing between Gibson and Swee Lee.  As evidenced by its irrational decision not to

set up distribution for Mesa/Boogie at all in Singapore and Vietnam, the broader termination of

Swee Lee as distributor for Gibson guitars and other equipment makes no economic sense.

Gibson stands to lose significant revenue, especially in sales in Singapore.

103.     Gibson's termination also terminates Swee Lee's long-standing distribution of

KRK Systems equipment, including KRK's line of speakers and other audio equipment.  Gibson

acquired KRK Systems in about 2011.  Since 2013, Swee Lee has distributed KRK products in

Swee Lee's territories in Southeast Asia, and the distribution arrangement has been enormously

profitable for KRK and Gibson.  On information and belief, the decision to terminate Swee Lee's distribution of KRK was not made by Gibson's regional team, but instead by Gibson's central management.

104.    Gibson's decision to terminate its prior course of dealing with Swee Lee is irrational but for Gibson's anticompetitive motive to drive Heritage from the U.S. market. Gibson knows the termination will result in millions in lost profits for Swee Lee.  Gibson is motivated to pressure BLT's ownership to force Heritage not to compete in the relevant markets so that Swee Lee can be reestablished as a Gibson distributor.

105.    Gibson's refusal to deal with Swee Lee is an integral part of its overall anticompetitive scheme to injure and destroy Heritage.  Gibson's sham litigation is intended to make Heritage an unprofitable business and to create a cloud of uncertainty over Heritage products in the marketplace, and it is succeeding.  Gibson's refusal to deal with Swee Lee is intended to weaken resolve to maintain Heritage as a competitive presence in the relevant market.  The effects of the refusal to deal work synergistically with Gibson's sham claims of contract breach and trademark infringement.

## VIII.   Gibson's Monopoly Power in the Relevant Markets

106.    Within the broader market for six-string electric guitars, there exist several well-defined submarkets, two of which constitute the relevant product markets for assessing the anticompetitive conduct in this case.  Those relevant markets, defined below, are determined by reasonable interchangeability as well as other practical indicia such as industry recognition of the submarket as a separate economic entity, the peculiar characteristics and uses of the products within them, distinct customers, distinct prices, and sensitivity to price changes.

### A.    The Relevant Markets

107.    Gibson's anticompetitive course of conduct, described herein, constitutes monopolization or, in the alternative, attempted monopolization in at least two relevant product submarkets: (a) the market for premium solid-body single-cutaway electric guitars (the Premium SBSC Market) in which Gibson's Les Paul guitars and Heritage's H-150s compete, and (b) the market for premium semi-hollow, double-cutaway electric guitars (the Premium SHDC Market) in which Gibson's ES-335s and Heritage's H-535s compete.  The contours of these relevant product markets are described below.

108.    The Premium SBSC Market and Premium SHDC Market (together, the "Relevant Markets") are determined by reasonable interchangeability, as well as industry recognition, distinct customers and prices, and peculiar characteristics, designs, functions, and uses of the product.

109.    For each of these product markets, the relevant geographic market is the United States.

### B.    Market Dynamics Generally

110.    The primary drivers of demand for guitars are (1) type (electric, acoustic, acoustic-electric), (2) body shape (which impacts both the "look" of the guitar as well as playability), (3) sound (which implicates factors like type and grade of wood, and the type of pickup used), and (4) construction (including quality of materials and overall craftsmanship).  What can appear to the untrained eye to be subtle differences to any of three of the last four drivers has a profound impact on their marketability, and consumer base.  That is because subtle details in guitar design, composition, and construction significantly affect the sound, playing experience, historical or other significance, and appearance of the guitar.

111.    Body shape of electric guitars is about more than aesthetic appearance (although that does play a role).  Distinctive body shapes—such as the single cut Les Paul or the double-cut ES—are associated with particular guitarists, genres, and eras of music.  There is nostalgia and prestige attached to the body shape of these guitars.  For example, the SBSC guitars are associated with classic rock and blues music and classic musicians and guitar heroes from the height of the eras of blues and rock and roll in the United States, including Eric Clapton, Peter Frampton, and Slash.

112.    The body shape of the guitar also affects the playability of the instrument: how easy it is to sit and stand with, and the fret access.  Experienced musicians are familiar with these subtle differences between guitar body shapes and would not consider other body shapes interchangeable for body shapes of guitars in the Premium SBSC Market and Premium SHDC Market.

113.    As Gibson asserted in other litigation, referring specifically to Premium SBSC Market consumers, they are "very sophisticated customers … looking for that shape." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 n.13 (6th Cir. 2005) (citing and quoting Gibson's district court oral argument).  That is equally true for purchasers in the Premium SHDC Market.

114.    Sound is a critical concern for musicians.  Different shapes, materials, pickups, and other features in guitars affect the sound.  For example, Premium SBSC guitars have a heavier sound of music than the Fender Telecaster (another high-selling single-cutaway electric guitar) in part because of the type of wood used in their construction.  Premium SBSC and Premium SHDC guitars are made using genuine mahogany.  Fender guitars are typically made using ash or alder wood, which has a thinner tonality associated with it.  Construction can also

37

affect the sound.  Premium SBSC and Premium SHDC guitars have a set-neck construction where the neck is glued to the body with a dovetail joint.  Other guitars including the Fender Stratocaster and the Telecaster use a bolt-on construction, where four screws hold the neck and the body together.  The tonal transfer between neck and body is perceived to be better in a set-neck than a bolt-on, resulting in a warmer and fuller sound.  All Premium SBSC and Premium SHDC guitars use two humbucker pickups, allowing for a warm, dark tone well suited to genres such as jazz, blues, metal, and rock.

115.    The number of frets on a guitar and access to them also affect the tone and playability of the instrument.  Twenty-two-fret guitars sound warmer and thicker because the neck pickup is placed closer to the neck of the guitar.  Twenty-two fret guitars are also easier to play because the neck of the guitar is shorter.

116.    Construction of guitars—including design and materials—can impact the sound, look, playability, longevity, and price of the guitar.  For example, a set-neck guitar is considerably more difficult and more expensive to construct than a bolt-on guitar, affecting the ultimate price of the product, as well as the number of guitars that can be made.  Premium SBSC and Premium SHDC guitars are constructed using complex designs with proprietary or otherwise unique and high-grade materials.

117.    All Premium SBSC and Premium SHDC guitars use the highest quality tonewoods.  For example, all Heritage H-150s are constructed using a single piece of high grade, genuine mahogany for the back.  Construction using a single piece of mahogany is difficult and uncommon.  In contrast, non-premium guitars like the Epiphone Les Paul use a lower quality mahogany—often sapele or luan—which is cheaper and often stripier in appearance than genuine mahogany.

118.     All Premium SBSC and Premium SHDC guitars are finished using nitrocellulose lacquer, whereas a non-premium models such as the Epiphone Les Paul use conventional polyester and polyurethane finishes.

119.     The scale length of a guitar is the distance between the nut and the bridge.  The scale length of a guitar plays a role in the "feel" and "playability" of a guitar.  For example, scale length affects the tension of the strings, which in turn affects the ease with which a musician can perform bends and vibrato.  Scale length also affects the distance between frets.  Premium SBSC and Premium SHDC guitars have a 24.75" scale length, yielding a characteristic warmer and thicker tone.  In contrast, the Fender Stratocaster and Telecaster both have a longer 25.5" scale length, which can produce a strong, bell-like tone with a well-defined bottom end.

120.     Tuning keys allow players to easily adjust string tension.  Tuners—or machine heads—can have a variety of placements on the headstock.  Different configurations of tuners affect the length of each string and therefore the tension and playability of the guitar.  Premium SBSC and Premium SHDC guitars have a rectangular head with two rows of three pins.  In contrast "Fender-style" tuners are typically arranged in a single diagonal row of six pins.

121.     There are distinct customers for guitars in each of these markets.  Guitars in the Premium SBSC and Premium SHDC Markets cater to discerning customers, including professional musicians and live performers, collectors, and wealthy buyers seeking to enjoy or recreate the nostalgia of iconic rock and roll eras.  Especially for advanced guitar players and high-end purchasers who comprise the vast majority of those who purchase Gibson's premium guitars, customers seek a particular type, shape, sound, and quality based on the music they wish to play.

122.    Gibson itself has acknowledged each of these demand drivers and recognizes that "high-end" guitars, which it has often defined as guitars priced above $2,000, fall in distinct market segments compared to economy guitars.  Gibson publicly recognizes that its marketing focuses on the "nostalgia" of high-end purchasers.  In fact, in order not to dilute the value of its high-end brand, Gibson sells lower-end guitars with similar designs (outside the Relevant Markets) under its Epiphone brand.  Epiphone versions of the Les Paul and ES-335 are sold for as low as $500 or even below that.  The price difference between products sold in the Premium SBSC and SHDC Markets, compared to lower-end versions of similarly shaped guitars (like the Epiphone line), can reach several thousand dollars.  This allows Gibson to market the non-Epiphone true Gibsons—including the Les Paul and ES series—as prestige and status products to the distinct customer base within the Relevant Markets.   For example, Gibson's CEO recognized the distinct pricing of Premium SBSC guitars, recognizing that "most guitar makers sell some single horn models" but "there are not very many within that price range" (referring the Les Paul pricing).  *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 311 F. Supp. 2d 690, 708 (M.D. Tenn. 2004).

123.    The cross-price elasticity of demand is sufficiently low for products within these Relevant Markets such that a hypothetical monopolist within each of the Relevant Markets could profitably impose a small but significant non-transitory increase in the price of its product.

### C.    The Premium SBSC Market

124.    The following features are present in Premium SBSC guitars: (1) the "iconic" single-cutaway shape with Florentine cutaway of the Les Paul and Heritage H-150, (2) genuine mahogany one piece solid-body with maple top and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22 frets, and (7) a 3x3 tuner pin configuration

on the headstock.  These features provide the look and sound distinctive in the Premium SBSC guitar.

125.     Premium SBSC guitars are also American made.  Consumers of Premium SBSC guitars want their instruments to be American made, in part because of the long history of guitar making in cities like Kalamazoo, Michigan, and because of the premium materials and highly skilled luthiers associated with American guitar making.

126.     The distinctive shape, material, features, and construction of guitars in the Premium SBSC Market was made famous by performers such as Eric Clapton, Peter Frampton, Slash, and, of course, Les Paul.  Guitars in the Premium SBSC Market appeal to blues musicians, classic rock, and metal players.

127.     Other guitars outside the Premium SBSC Market are not reasonably interchangeable with the guitars in the Premium SBSC Market, such as the Les Paul and the Heritage H-150, given their characteristics (e.g., shape and style), their quality and nature of construction (e.g., type and grade of wood), and their uses (e.g., distinct sound).

128.     Industry participants and consumers recognize guitars within the Premium SBSC Market as a distinct category based on those characteristics and uses, as well as their distinct customers, distinct prices, and sensitivity to price changes.  There is, for example, substantial trade press and online content specifically comparing the H-150 to the Les Paul.

129.     The cross-price elasticity of demand is sufficiently low for products within this Relevant Market such that a hypothetical monopolist within the Premium SBSC Market could profitably impose a small but significant non-transitory increase in the price of its product.

130.     For example, most customers that purchase a Gibson Les Paul guitar would view Heritage's H-150 as a reasonably interchangeable substitute because it is the same type and

similar shape and offers similar sounds and quality of construction.  Those customers, for example, would not view a Fender Stratocaster or Telecaster as a reasonably interchangeable substitute for the Les Paul or H-150.  As detailed above, the Fender Stratocaster and Telecaster have very different shapes, much different construction, and vastly different sounds.

131.    The body shape of the Premium SBSC is iconic.  It evokes a bygone era of music, and the guitar heroes who embody that period of greatness.  Companies like Gibson and Heritage embrace that nostalgia, leaning into the cultural and historical significance of the shape and design to attract consumers.  Gibson has acknowledged that its customers seek out *that* shape.

132.    Because of the Settlement Agreement, and its authorization to make and sell the guitars depicted in Exhibit B as modified, the Heritage H-150 is the closest substitute for consumers seeking to buy a Les Paul style guitar in the Premium SBSC market.

133.    The price or availability of guitars outside the Premium SBSC Market do not constrain the price of guitars inside the Premium SBSC Market, including the Les Paul or H-150.

134.    Gibson's monopoly power in each of the Relevant Markets is evidenced by its supra-competitive pricing and excessive margins.  Despite widespread criticisms regarding the quality of Gibson guitars, Gibson's average pricing is significantly (over $1,000 in some cases) above competitive levels and its margins are significantly higher than competitors' margins.

135.    On information and belief, Gibson has market share of at least 70 percent by unit volume and revenue within the Premium SBSC Market.

### D.    The Premium SHDC Market

136.    The following features are present in Premium SHDC guitars: (1) the iconic wings formed by the double cutaway and two violin-style f-holes over the hollow chambers of the ES-335 and Heritage H-535, (2) genuine mahogany semi-hollow body with maple block and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22

frets, and (7) a 3x3 tuner pin configuration on the headstock.  These features provide the look and sound distinctive in the Premium SHDC guitar.

137.    Premium SHDC guitars are also American made.  Consumers of Premium SHDC guitars want their instruments to be American made, in part because of the long history of guitar making in cities like Kalamazoo, Michigan, and because of the premium materials and highly skilled luthiers associated with American guitar making.

138.    The distinctive shape, material, features, and construction of guitars in the Premium SHDC Market was made famous by music legends like Chuck Berry, Eric Clapton, and B.B. King.  Guitars in the Premium SHDC Market are suitable for a variety of genres including blues, jazz, and rock.

139.    With respect to Premium SHDC guitars, such as Gibson's ES-335 and Heritage's H-535, other guitars on the market are not reasonably interchangeable with those Premium SHDC guitars given their quality and nature of construction (e.g., type and grade of wood), characteristics (e.g., shape and style), and uses (e.g., distinct sound).

140.    Industry participants and consumers recognize guitars within the Premium SHDC Market as a distinct category based on those characteristics and uses, as well as their distinct customers, distinct prices, and sensitivity to price changes.  There is, for example, substantial trade press and online content specifically comparing the Heritage H-535 and Gibson's ES-335.

141.    The cross-price elasticity of demand is sufficiently low for products within this Relevant Market such that a hypothetical monopolist within the Premium SHDC Market could profitably impose a small but significant non-transitory increase in the price of its product.

142.    Because of the Settlement Agreement, and its authorization to make and sell the guitars depicted in Exhibit B as modified, the Heritage H-535 is the closest substitute for consumers seeking to buy a ES-335 style guitar in the Premium SBSC market.

143.    The price or availability of guitars outside the Premium SHDC Market do not constrain the price of guitars in the Premium SHDC Market, including the ES body guitars and the H-535.

144.    Gibson's monopoly power in each of the Relevant Markets is evidenced by its supra-competitive pricing and excessive margins.  Despite widespread criticisms regarding the quality of Gibson guitars, Gibson's average pricing is significantly (over $1,000 in some cases) above competitive levels and its margins are significantly higher than competitors' margins.

145.    On information and belief, Gibson has market share of at least 70 percent by unit volume and revenue within the Premium SHDC Market.

**E.    Barriers to Entry and Expansion**

146.    There are high barriers to entry in each of the Relevant Markets.  Consumers are acutely aware of the history of guitar making in the United States, including in particular in Kalamazoo, Michigan.  Gibson and Heritage both lean into the nostalgia and historical significance that drives customers to purchase and play guitars in the Relevant Markets.  They are part of a great American tradition of guitar design and craftsmanship.  New entrants cannot compete with the skill, experience, and history of companies like Gibson and Heritage.

147.    In addition, Gibson's trademark on the Les Paul and ES shapes, as well as its history of litigation and attacks on competitors discourages entry into the Relevant Markets and chills investment necessary to expand even for those smaller participants.  For small brands, just the accusation from Gibson that they are "counterfeits" casts a pall over the entire operation, damaging the brand in the eyes of consumers.  The need for capital investment, skill in the art,

and the time and costs associated with establishing guitar-making facilities and attracting qualified luthiers also act as high barriers to entry.

148.    The Settlement Agreement makes Heritage a unique competitive threat because the Settlement Agreement expressly authorizes Heritage to make and sell guitars in each of the Premium SBSC Market and Premium SHDC Market.  Notwithstanding the present sham litigation, that authorization incentivizes the investment necessary to expand output and promotion and continue the quality craftsmanship that enhances competition.

149.    In fact, as a result of Gibson's Asserted Trademarks and its litigious reputation and history, the Heritage guitars—by virtue of the Settlement Agreement—are the closest substitutes to the Gibson Les Paul and Gibson ES in the Premium SBSC and Premium SHDC Markets, respectively.

150.    While Gibson's Asserted Trademarks are only held in the United States, foreign guitar companies cannot enter the markets for Premium SBSC and Premium SHDC guitars because consumers do not consider non-American made guitars to be close substitutes for guitars in those markets.  That is because "American made" is a hallmark of guitars in the Premium SBSC and Premium SHDC Markets because of the strong tradition—born in Kalamazoo, Michigan—of American designed and built guitars that is central to the prestige, quality, and nostalgia associated with guitars in those markets.

## IX.    Antitrust Injury to Heritage

151.    Gibson's baseless threats, sham litigation, and coercive activities are causing significant and ongoing injury to Heritage.  Gibson's conduct has hampered competition from Heritage and threatens to limit Heritage as a competitive threat going forward and even to drive it out of the Relevant Markets.

152.    Gibson's baseless threats presented Heritage with a Hobson's Choice: exit the Relevant Markets or suffer crippling litigation costs that will render Heritage unable to compete as aggressively and ultimately may render it non-competitive.  Each option is anticompetitive.  Heritage chose the latter of the anticompetitive options, in the hopes of at least litigating in an appropriate forum.  Although formally initiated by Heritage to protect its interest, the practical reality is that this litigation—and the costs to Heritage that flow from it—were proximately caused by Gibson's anticompetitive conduct.  At this point, the only way Heritage can avoid the damaging costs of litigation is to exit one or both of the Relevant Markets.

153.    The costs of litigating are stifling to Heritage.  As a result of this litigation, Heritage is currently unprofitable.  Instead of investing in growth, marketing, and increasing output, it is forced to spend potentially millions of dollars on litigation.  This was precisely Gibson's intent.  Gibson's president expressly threatened that Gibson could outspend its much smaller rival, Heritage, and effectively drive it from the market.  Using litigation as an anticompetitive weapon was both the specific intent and has been the effect of Gibson's pre-litigation and litigation conduct.  Gibson's pre-litigation and litigation anticompetitive conduct is the sole cause of the stifling litigation costs that have driven Heritage to unprofitability.  Heritage would not have suffered this injury without Gibson's anticompetitive course of conduct, including its pre-litigation and litigation conduct.

154.    Not only do the costs of litigation render Heritage unable to compete as effectively and threaten to drive Heritage out of the market completely, but Gibson's baseless claims that Heritage's guitars infringe trademarks and that they are "by definition counterfeit Gibsons" casts a false shadow of illegitimacy over Heritage in the marketplace, which amplifies the anticompetitive impact of the lawsuit itself.

155.     Furthermore, on information and belief, Gibson's agreements with dealers prohibit them from selling products that infringe Gibson's Asserted Trademarks, and Gibson has distributed letters to those dealers urging them not to sell products that infringe those trademarks. Accordingly, Gibson's baseless claims that Heritage's products unlawfully infringe its Asserted Trademarks hinders Heritage's ability to compete and to grow and to challenge Gibson's monopolies in the Relevant Markets.

156.     In addition to using baseless threats and sham litigation to unlawfully raise its rival's costs and stifle competition, Gibson has leveraged its market position to threaten and punish one of Heritage's investors in a thinly veiled attempt to coerce its investor to facilitate the withdrawal of Heritage from the Relevant Markets.

## X.     Effect on Competition

157.      Gibson's anticompetitive course of conduct, including its baseless threats and sham litigation against Heritage, allows it to maintain its monopoly position in the Relevant Markets.  In the alternative, it engaged in the anticompetitive course of conduct with the specific intent to monopolize the Relevant Markets, and Gibson is dangerously close to obtaining that monopoly.

158.     Heritage is a unique competitive threat.  It combines the premium quality designs and Made-in-America craftsmanship with the Kalamazoo heritage that other newer entrants in the market cannot match.  The Settlement Agreement also allows Heritage to lawfully manufacture products that are particularly close substitutes to Gibson's Les Paul and ES body designs.  Furthermore, the recent investment from BLT sets Heritage on a growth trajectory that threatens Gibson's long-held dominant position.  For example, Heritage is on track to double its sales in each of the last two years.  While Heritage currently occupies only a modest share in the Relevant Markets, it, like no other player, has the potential to defeat Gibson's stranglehold on the

Relevant Markets.  Accordingly, foreclosing competition from Heritage eliminates competition from the most significant threat to Gibson's monopoly.

159.    Further, Gibson's course of anticompetitive conduct against Heritage is part of an overall scheme to intimidate and drive away all rivals—from both the premium markets (including the Relevant Markets) and non-premium markets.  On information and belief, Gibson has threatened other competitors who may have offered similar products.  Some of those boutique shops have been forced to discontinue sales of their products because they simply cannot afford to litigate against Gibson, the dominant player in the market.

160.    In addition, Heritage is renowned for quality craftmanship.  In contrast, the quality of Gibson's products comes under regular scrutiny from consumers and industry participants.  Heritage therefore presents a significant competitive threat because it is known for its premium, high quality products.  Heritage's presence in the market creates and increases incentives for Gibson to maintain and improve quality, as well as price competition.  Elimination of that competition would reduce the incentive to compete on quality, as well as increase prices in the Relevant Markets.

161.    Gibson's predatory course of conduct, including its *modus operandi* of serving serial cease-and-desist letters claiming trademark infringement, constitutes a barrier to entry and expansion in the Relevant Markets.  The Settlement Agreement itself provides Heritage a unique position in the marketplace because that agreement provides (or ought to provide) Heritage freedom to operate as a competitor.  Accordingly, injury to Heritage constitutes injury to competition as a whole especially because Heritage is uniquely positioned to challenge Gibson's monopolies in the Relevant Markets.

162.    As a result of Gibson's overall course of conduct, competition in each of the Relevant Markets has been weakened, and competition from the greatest threat to Gibson's monopoly has been foreclosed and is in danger of being eliminated.

163.    The result of Gibson's conduct is to reduce output and inflate prices in the Relevant Markets, and to stifle competition that would increase output, improve overall quality, and lower price.  Because of Gibson's anticompetitive conduct, consumers in each of the Relevant Markets face more limited choices and higher prices and Gibson threatens to further limit those choices and increase those prices by excluding Heritage or otherwise foreclosing it from being an effective competitor.

## XI.    Effect on Interstate Commerce

164.    At all material times, Gibson and Heritage have sold products in each of the Relevant Markets across state lines and sold to customers located outside the states in which Heritage and Gibson are incorporated and based.

165.    During the relevant period, in connection with the sale of products in each of the Relevant Markets, money as well as contracts, bills, and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

## <u>COUNT I</u>

### (Declaratory Judgment that Heritage Has Not Breached the 1991 Settlement Agreement)

166.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

167.    An actual, justiciable, and continuing case or controversy exists between Plaintiff and Gibson regarding Heritage's compliance with the terms of the Settlement Agreement.

168.    Gibson has alleged that certain Heritage products violate the terms of the Settlement Agreement.

169.    Heritage denies Gibson's allegations and asserts that the Heritage models identified in Gibson's February 20, 2020 letter are expressly authorized pursuant to Paragraphs 4, 6, 7(a) and 7(b) of the Settlement Agreement.

170.    Plaintiff is therefore entitled to a judicial declaration that it is not in breach of the Settlement Agreement.

## COUNT II

### (Declaratory Judgment of Non-Infringement of the '606 Mark)

171.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

172.    An actual, justiciable, and continuing case or controversy exists between Plaintiff and Gibson regarding alleged infringement of the '606 Mark.  Gibson has accused Heritage of having infringed and infringing the '606 Mark.  Heritage denies the allegations.

173.    There is no likelihood of confusion, mistake or deception as to the affiliation, connection, or association of Gibson with Heritage or as to the origin, sponsorship, or approval of the parties' respective products.

174.    Plaintiff is therefore entitled to a judicial declaration that Heritage: (a) has not infringed, and is not infringing, the '606 Mark pursuant to 15 U.S.C. § 1114(1); (b) has not engaged in, and is not engaging in counterfeiting, of the '606 Mark pursuant to 15 U.S.C. § 1114(1); and (c) has not engaged in, and is not engaging in, false designation of origin or unfair competition with respect to the '606 Mark pursuant to 15 U.S.C. § 1125(a).

## COUNT III

### (Declaratory Judgment of No Dilution of the '606 Mark)

175.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

176.    The '606 Mark is not distinctive.

177.    The '606 Mark was not famous at the time Heritage began using the single-cut design on its guitars.

178.    There is no likelihood of dilution by blurring or by tarnishment as a result of Heritage's continued use of the single-cut design on its guitars.

179.    Plaintiff is therefore entitled to a judicial declaration that Heritage has not diluted, and is not diluting, the '606 Mark pursuant to 15 U.S.C. § 1125(c).

## COUNT IV

### (Declaratory Judgment of Non-Infringement of the '277 Mark)

180.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

181.    An actual, justiciable, and continuing case or controversy exists between Plaintiff and Gibson regarding alleged infringement of the '277 Mark.  Gibson has accused Heritage of having infringed and infringing the '277 Mark.  Heritage denies the allegations.

182.    There is no likelihood of confusion, mistake or deception as to the affiliation, connection, or association of Gibson with Heritage or as to the origin, sponsorship, or approval of the parties' respective products.

183.    Plaintiff is therefore entitled to a judicial declaration that Heritage: (a) has not infringed, and is not infringing, the '277 Mark pursuant to 15 U.S.C. § 1114(1); (b) has not

engaged in, and is not engaging in counterfeiting, of the '277 Mark pursuant to 15 U.S.C. §

1114(1); and (c) has not engaged in, and is not engaging in, false designation of origin or unfair

competition with respect to the '277 Mark pursuant to 15 U.S.C. § 1125(a).

## COUNT V

### (Declaratory Judgment of No Dilution of the '277 Mark)

184.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs

as if fully set forth herein.

185.    The '277 Mark is not distinctive.

186.    The '277 Mark was not famous at the time Heritage began using the single-cut

design on its guitars.

187.    There is no likelihood of dilution by blurring or by tarnishment as a result of

Heritage's continued use of the single-cut design on its guitars.

188.    Plaintiff is therefore entitled to a judicial declaration that Heritage has not diluted,

and is not diluting, the '277 Mark pursuant to 15 U.S.C. § 1125(c).

## COUNT VI

### (Monopolization, 15 U.S.C. § 2)

189.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs

as if fully set forth herein.

190.    Gibson's demands that Heritage cease and desist from competition in the

Relevant Markets were objectively baseless, as are each of the counterclaims it has asserted in

this matter.  No reasonable litigant could realistically expect success on the merits with respect to

those assertions and those counterclaims.  Instead, those assertions were made and counterclaims

brought with the subjective intent of using the threat of litigation, and then the litigation process itself, as an anticompetitive weapon.

191.    Gibson's coercive conduct directed at Swee Lee is part of an overall course of conduct intended to maintain Gibson's monopoly in the Relevant Markets.  Gibson's decision to terminate Swee Lee for no valid business reason ended a long-standing, profitable course of dealing between Gibson and Swee Lee.  Instead, Gibson has decided to sacrifice short-term profits for the purpose of maintaining its monopoly in the Relevant Markets by coercing or pressuring Heritage's investor to withdraw Heritage from competition.  The decision to terminate Swee Lee, and to deprive Swee Lee of the Mesa/Boogie opportunity, make no economic sense except as part of a scheme to monopolize.

192.    Gibson's efforts to raise its rival's cost through sham litigation and to pressure one of Heritage's significant investors to chill further investment are part of an integrated scheme.  Each component of the scheme is intended to achieve effects that, synergically, cripple competition from Heritage in the Relevant Markets.

193.    Gibson's sham cease-and-desist threats, sham litigation, and other coercive conduct constitutes exclusionary conduct that allows Gibson to obtain or maintain monopoly power in each of the Relevant Markets pled herein.

194.    Gibson's claimed intellectual property, and litigious enforcement of that intellectual property, constitute a high barrier to entry and expansion in each of the Relevant Markets.  Furthermore, the importance of tradition and legacy to the consumer demand for products in the Relevant Markets makes successful new entry in the Relevant Markets unlikely.

195.    Gibson's exclusionary conduct has caused economic injury to Heritage, in the form of litigation costs and lost profits that weakens Heritage as a competitive threat, and

threatens its future competitive strength and even survival.  Gibson's exclusionary conduct is the sole cause of that harm to Heritage.

196.     Gibson's exclusionary conduct causes injury to competition as a whole in each of the Relevant Markets because it allows and will allow Gibson to further entrench its monopoly position in each of the Relevant Markets.

## COUNT VII

### (Attempted Monopolization, 15 U.S.C. § 2)

197.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

198.     Gibson's exclusionary conduct has allowed it to maintain or obtain monopoly power in each of the Relevant Markets.  In the alternative, the exclusionary conduct constitutes an unlawful attempt to monopolize each of those Relevant Markets.

199.     Gibson's demands that Heritage cease and desist from competition in the Relevant Markets were objectively baseless, as are each of the counterclaims it has asserted in this matter.  No reasonable litigant could realistically expect success on the merits with respect to those assertions and those counterclaims.  Instead, those assertions were made and counterclaims brought with the subjective intent of using the threat of litigation, and then the litigation process itself, as an anticompetitive weapon.

200.     Gibson's coercive conduct directed at Swee Lee is part of an overall course of conduct intended to obtain a monopoly for Gibson in each of the Relevant Markets.  Gibson's decision to terminate Swee Lee for no valid business reason ended a long-standing, profitable course of dealing between Gibson and Swee Lee.  Instead, Gibson has decided to sacrifice short-term profits for the purpose of obtaining a monopoly in each of the Relevant Markets by

coercing or pressuring Heritage's investor to withdraw Heritage from competition.  The decision to terminate Swee Lee, and to deprive Swee Lee of the Mesa/Boogie opportunity, make no economic sense except as part of a scheme to monopolize.

201.    Gibson's efforts to raise its rival's cost through sham litigation and to pressure one of Heritage's significant investors to chill further investment are part of an integrated scheme.  Each component of the scheme is intended to achieve effects that, synergically, cripple competition from Heritage.

202.    Gibson's sham cease-and-desist threats, sham litigation, and other coercive conduct constitutes exclusionary conduct undertaken with the specific intent to monopolize each of the Relevant Markets pled herein.

203.    Gibson's exclusionary conduct creates a dangerous probability of Gibson obtaining monopoly power in each of the Relevant Markets.

204.    Gibson's claimed intellectual property, and litigious enforcement of that intellectual property, constitute a high barrier to entry and expansion.  Furthermore, the importance of tradition and legacy to the consumer demand for products in the Relevant Markets makes successful new entry in the Relevant Markets unlikely.

205.    Gibson's exclusionary conduct has caused economic injury to Heritage, in the form of litigation costs and lost profits that weakens Heritage as a competitive threat, and threatens its future competitive strength and even survival.  Gibson's exclusionary conduct is the sole cause of that harm to Heritage.

206.    Gibson's exclusionary conduct causes injury to competition as a whole in each of the Relevant Markets because it allows and will allow Gibson to obtain a monopoly position in each of the Relevant Markets.

## COUNT VIII

### (Monopolization, Mich. Comp. Laws Ann. § 445.773)

207.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

208.    Gibson's demands that Heritage cease and desist from competition in the Relevant Markets were objectively baseless, as are each of the counterclaims it has asserted in this matter.  No reasonable litigant could realistically expect success on the merits with respect to those assertions and those counterclaims.  Instead, those assertions were made and counterclaims brought with the subjective intent of using the threat of litigation, and then the litigation process itself, as an anticompetitive weapon.

209.    Gibson's coercive conduct directed at Swee Lee is part of an overall course of conduct intended to maintain Gibson's monopoly in the Relevant Markets.  Gibson's decision to terminate Swee Lee for no valid business reason ended a long-standing, profitable course of dealing between Gibson and Swee Lee.  Instead, Gibson has decided to sacrifice short-term profits for the purpose of maintaining its monopoly in the Relevant Markets by coercing or pressuring Heritage's investor to withdraw Heritage from competition.  The decision to terminate Swee Lee, and to deprive Swee Lee of the Mesa/Boogie opportunity, make no economic sense except as part of a scheme to monopolize.

210.    Gibson's efforts to raise its rival's costs through sham litigation and to pressure one of Heritage's significant investors to chill further investment are part of an integrated scheme.  Each component of the scheme is intended to achieve effects that, synergically, cripple competition from Heritage.

56

211.     Gibson's sham cease-and-desist threats, sham litigation, and other coercive conduct constitutes exclusionary conduct that allows Gibson to obtain or maintain monopoly power in each of the Relevant Markets pled herein.

212.     Gibson's claimed intellectual property, and litigious enforcement of that intellectual property, constitute a high barrier to entry and expansion.  Furthermore, the importance of tradition and legacy to the consumer demand for products in the Relevant Markets makes successful new entry in the Relevant Markets unlikely.

213.     Gibson's exclusionary conduct has caused economic injury to Heritage in Michigan, in the form of litigation costs and lost profits that weakens Heritage as a competitive threat, and threatens its future competitive strength and even survival.  Gibson's exclusionary conduct is the sole cause of that economic injury to Heritage.

214.     Gibson's exclusionary conduct causes injury to competition as a whole in each of the Relevant Markets, including to consumers in Michigan, because it allows and will allow Gibson to entrench its monopoly position in each of the Relevant Markets.

215.     Gibson's violation of Mich. Comp. Laws Ann. § 445.773 was flagrant.

## COUNT IX

### (Attempted Monopolization, Mich. Comp. Laws Ann. § 445.773)

216.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

217.     Gibson's exclusionary conduct has allowed it to maintain or obtain monopoly power in each of the Relevant Markets.  In the alternative, the predatory and anticompetitive conduct described herein constitutes an unlawful attempt to monopolize each of those Relevant Markets.

218.    Gibson's demands that Heritage cease and desist from competition in the Relevant Markets were objectively baseless, as are each of the counterclaims it has asserted in this matter.  No reasonable litigant could realistically expect success on the merits with respect to those assertions and those counterclaims.  Instead, those assertions were made and counterclaims brought with the subjective intent of using the threat of litigation, and then the litigation process itself, as an anticompetitive weapon.

219.    Gibson's coercive conduct directed at Swee Lee is part of an overall course of conduct intended to obtain a monopoly for Gibson in each of the Relevant Markets.  Gibson's decision to terminate Swee Lee for no valid business reason ended a long-standing, profitable course of dealing between Gibson and Swee Lee.  Instead, Gibson has decided to sacrifice short-term profits for the purpose of obtaining a monopoly in the Relevant Markets by coercing or pressuring BLT to withdraw Heritage from competition.  The decision to terminate Swee Lee, and to deprive Swee Lee of the Mesa/Boogie opportunity, make no economic sense except as part of a scheme to monopolize.

220.    Gibson's efforts to raise its rival's cost through sham litigation and to pressure one of Heritage's significant investors to chill further investment are part of an integrated scheme.  Each component of the scheme is intended to achieve effects that, synergically, cripple competition from Heritage.

221.    Gibson's sham cease-and-desist threats, sham litigation, and other coercive conduct constitutes exclusionary conduct undertaken with the specific intent to destroy competition and monopolize each of the Relevant Markets pled herein.

222.    Gibson's exclusionary conduct creates a dangerous probability of Gibson obtaining monopoly power in each of the Relevant Markets.

223.     Gibson's claimed intellectual property, and litigious enforcement of that intellectual property, constitutes a high barrier to entry and expansion.  Furthermore, the importance of tradition and legacy to the consumer demand for products in the Relevant Markets makes successful new entry in the Relevant Markets unlikely.

224.     Gibson's exclusionary conduct has caused economic injury to Heritage in Michigan, in the form of litigation costs and lost profits that weakens Heritage as a competitive threat, and threatens its future competitive strength and even survival.  Gibson's exclusionary conduct is the sole cause of that economic injury to Heritage.

225.     Gibson's exclusionary conduct causes injury to competition as a whole in each of the Relevant Markets, including to consumers in Michigan, because it allows and will allow Gibson to maintain or obtain a monopoly position in each of the Relevant Markets.

226.     Gibson's violation of Mich. Comp. Laws Ann. § 445.773 was flagrant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.       A declaration that Heritage has not breached the Settlement Agreement.

B.       A declaration that Heritage (a) has not infringed, and is not infringing, the '606 Mark pursuant to 15 U.S.C. § 1114(1); (b) has not engaged in, and is not engaging in counterfeiting, of the '606 Mark pursuant to 15 U.S.C. § 1114(1); and (c) has not engaged in, and is not engaging in, false designation of origin or unfair competition with respect to the '606 Mark pursuant to 15 U.S.C. § 1125(a).

C.       A declaration that Heritage has not diluted, and is not diluting the '606 Mark pursuant to § 1125(c).

D.       A declaration that Heritage (a) has not infringed, and is not infringing, the '277

Mark pursuant to 15 U.S.C. § 1114(1); (b) has not engaged in, and is not engaging in counterfeiting, of the '277 Mark pursuant to 15 U.S.C. § 1114(1); and (c) has not engaged in, and is not engaging in, false designation of origin or unfair competition with respect to the '277 Mark pursuant to 15 U.S.C. § 1125(a).

E.      A declaration that Heritage has not diluted, and is not diluting the '277 Mark pursuant to § 1125(c).

F.      For the federal antitrust claims, Counts VI and VII, (1) treble damages, cost of suit, and attorney's fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 14, and (2) injunctive relief from the exclusionary course of conduct alleged herein pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

G.      For the claims under the Michigan Antitrust Reform Act ("MARA"), Counts VIII and IX, (1) treble damages, cost of suit, and attorney's fees pursuant to Section 8(2) of MARA, Mich. Comp. Laws Ann. § 445.778(2), and (2) injunctive relief from the exclusionary course of conduct alleged herein pursuant to Section 8(2) of MARA, Mich. Comp. Laws Ann. § 445.778(2).

H.      Awarding any other remedy or relief to which Plaintiff may be entitled and which is deemed appropriate by the Court.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury for all eligible counts contained within this Complaint.

Respectfully submitted,

VARNUM LLP
*Attorneys for Plaintiff and Counterclaim Defendant Heritage Guitar, Inc.*

Dated: July 21, 2021

Gary J. Mouw (P69236)
333 Bridge Street NW Suite 1700
Grand Rapids, MI 49504
(616) 336-6000
gjmouw@varnumlaw.cosm

and

By: */s/ Mark G. Matuschak*
Mark G. Matuschak
Vinita Ferrera
Mark A. Ford (*Admission Pending*)
Allyson Slater
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6559 (t)
(617) 526-5000 (f)
mark.matuschak@wilmerhale.com

Holly A. Ovington (*Admission Pending*)
Wilmer Cutler Pickering Hale and Dorr LLP
49 Park Lane
London W1K 1PS
United Kingdom

Jared D. Hoffman
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007