IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERITAGE GUITAR, INC.,                    )
                                          )
           Plaintiff,                     )
                                          )   Case No. 20-cv-229
vs.                                       )
                                          )   Honorable Hala Y. Jarbou
GIBSON BRANDS, INC.,                      )
                                          )   Magistrate Judge Ray Kent
           Defendant.                     )
                                          )
                                          )

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
PARTIAL MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**I. INTRODUCTION** ................................. ......................................................................1

**II. LEGAL STANDARD**......................... ......................................................................2

**III. ARGUMENT** ................................. ......................................................................3

    A. Heritage Improperly Defines the Relevant Market By Making it Exceptionally Narrow and Including Gibson's Trademarks .........4

    B. Heritage Does not Adequately Plead Predatory or Anticompetitive Conduct. ............8

        1. Gibson's Trademark Policing Conduct is Protected by the *Noerr-Pennington* Doctrine ............................................. 9

        2. Gibson's Termination of the Distribution Contract does not Rise to the Level of Predatory or Anticompetitive Conduct ................................................................18

**IV. CONCLUSION** ................................. ...................................................... 21

i

## TABLE OF AUTHORITIES

### CASES

*American Council of Certified Podiatric & Surgeons v. American Bd. of Podiatric Surgery, Inc.*
185 F.3d 606, 622 (6th Cir. 1999)................................................................................................... 5

*Ashcroft v. Iqbal*
129 S.Ct. 1937, 1949 (2009) ......................................................................................................... 2

*Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*
No. 2:11-cv-427, 2015 WL 12999664, at *4 (S.D. Ohio Mar. 12, 2015) .............................11,12

*Belfiore v. The New York Times Co.*
826 F.2d 177, 180 (2d Cir. 1987).................................................................................................. 8

*Campbell v. PMI Food Equipment Grp., Inc.*
509 F.3d 776, 790 (6th Cir. 2007)............................................................................................... 10

*Carell v. Shubert Organization, Inc.*
S.D.N.Y. 2000 ............................................................................................................................... 7

*City of Columbia v. Omni Outdoor Advert., Inc.*
499 U.S. 365, 380 (1991) ............................................................................................................ 10

*Conwood Co., L.P. v. U.S. Tobacco Co.*
290 F.3d 768, 782 (6th Cir. 2002) ............................................................................................. 3,4

*EQMD, Inc. v. Farm Bureau General Insurance Company of Michigan*
2021 WL 843145 at *4 ..............................................................................................................9,10

*Formula One Licensing, B.V. v. Purple Interactive Ltd.*
No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. 2001) ..................................................... 8

*Foundation for Interior Design Educ. Research v. Savannah College of Art & Design*
244 F.3d 521, 530 (6th Cir. 2001) .............................................................................................3,6

*Frito–Lay, Inc. v. Bachman Co.*
659 F.Supp. 1129, 1137 (S.D.N.Y. 1986) .................................................................................... 8

*Fritz v. Charter Township of Comstock*
592 F.3d 718, 722 (6th Cir. 2010)................................................................................................. 2

*Generac Corp. v. Caterpillar Inc.*
172 F.3d 971, 977 (7th Cir. 1999) ............................................................................................... 7

*German Automotive Manufacturers Antitrust Litigation*
497 F.Supp.3d 745, 747 (N.D. Cal. 2020) ....... ............... ............................................. 6

*Gianna Enterproses v. Miss World (Jersey) Ltd.*
551 F.Supp. 1348, 1354 (S.D.N.Y. 1982)........... ............ ............................................. 8

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*
960 F.Supp. 701, 705 (S.D.N.Y. 1997) ............... ....................................................... 7

*Goldman v. Loubella Extendables*
283 N.W.2d 695, 699 (Mich. Ct. App. 1979) ... ............... ........................................ 3

*J.M. Smucker Co. v. Hormel Food Corp.*
526 F.Supp. 294, 309 (N.D. Ohio 2021) ......... ........................................ 1,12,15,18

*Lawler v. Marshall*
898 F.2d 1196, 1199 (6th Cir. 1990) ............... ....................................................... 2

*Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n*
524 F.3d 726, 733 (6th Cir. 2008) ............... ................... ....................................... 6

*Morgan v. Church's Fried Chicken*
829 F.2d 10, 12 (6th Cir. 1987)........... ................................................................... 2

*Nabi Biopharmaceuticals v. Roxane Lab'ys, Inc.*
No. 2:05-CV-889, 2007 WL 894473, at *2 (S.D. Ohio Mar. 21, 2007) ..................................... 2

*National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*
419 F.3d 462, 473 (6th Cir. 2005) ............... ............................................................ 2,6

*Northstar Energy LLC v. Encana Corp.*
No. 13-CV-200, 2014 WL 5343423, at *9 (W.D. Mich. Mar. 10, 2014) ..................................... 3

*Novell, Inc. v. Microsoft Corp.*
731 F.3d 1064, 1075 (10th Cir. 2013) ............... ................................................ 19

*Partner & Partner, Inc. v. ExxonMobil Oil Corp.*
326 F. App'x 892, 898 (6th Cir. 2009)............... ..................................................... 3

*Prakash v. Altadis U.S.A. Inc.*
No. 5:10CV0033, 2012 WL 1109918, at *10 (N.D. Ohio Mar. 30, 2012) ............................. 10

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*
508 U.S. 49, 60 (1993) ..................... ......................................... 11,12,14,18

*Qualitex Co. v. Jacobson Products Co., Inc.*
514 U.S. 159, 163-64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)..................................... 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*
124 F.3d 430, 437-41 (3d Cir. 1997) ................................................... 6

*RJ Mach. Co., Inc. v. Canada Pipeline Accessories Co. Ltd.*
2013 WL 8115445 (W.D. Tex. 2013) .............................................9,10

*Rondigo, LLC v. Twp. of Richmond, Mich.*
No. 08-cv-10432, 2012 WL 1021726, at *2 (E.D. Mich. Mar. 27, 2012) .................................. 10

*Scooter Store, Inc. v. SpinLife.com, LLC*
777 F.Supp. 2d 1102, 1117 (S.D. Ohio 2011) . ............................. 10

*Shaw v. Rolex Watch, USA, Inc.,* 673 F.Supp.
674, 679 (S.D.N.Y. 1987)......................................................... 8

*Spectrum Sports, Inc. v. McQuillan*
506 U.S. 447, 456 (1993)........................................................ 3

*St. Luke's Hospital v. ProMedica Health System, Inc.*
8 F.4th 479, 486 (6th Cir. 2021 ......................................... 18,19,20

*TV Communications Network, Inc. v. Turner Network Television, Inc.*
964 F.2d 1022, 1025 (10th Cir. 1992) .................................... 6

*United States v. Colgate & Co.*
250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919) .................... 19

*United States v. Microsoft Corp.*
253 F.3d 34, 58 (D.C. Cir. 2001) ........................................ 20

*Verizon Comms. Inc. v. Law Offs. Of Curtis Trinko*
540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) ..................... 19

*Viamedia, Inc. v. Comcast Corp.*
951 F3d 429, 462 (7th Cir. 2020) ....................................... 19

*Weber v. NFL,* 112 F.Supp.
2d 667, 673 (N.D. Ohio 2000) .............................................7,9

*Westmac, Inc. v. Smith*
797 F.2d 313, 318 (6th Cir. 1986) .....................................10,18

## CODES AND STATUES

15 U.S.C. § 1114............................................................. 14

15 U.S.C. § 1116............................................................. 14

15 U.S.C. § 1117. ................................ ................................................................14

15 U.S.C. § 1127................................ ................................................................14

15 U.S.C. § 2 2201 ................ ................................................................................ 2

Mich. Comp. Laws Ann. § 445.773................. ................................................... 2

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Gibson Brands, Inc. ("Gibson") respectfully submits this Memorandum of Law in Support of Its Partial Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC").

## I.    <u>INTRODUCTION</u>

On December 13, 2021, the Court allowed Heritage to file the SAC rejecting Gibson's Opposition of the Motion to Amend its Complaint. Gibson is filing this Motion to Dismiss, because even if this Court considers all of Heritage's accusations to be "considered" as true, the SAC monopoly claims fail, as plead, as a matter of law.

The antitrust claims in the SAC are fatally flawed and thereby fail for three reasons: First, Heritage mischaracterizes the relevant monopoly market *as extremely narrow*, further limiting the definition by the use of Gibson's valid trademarks. [*See* SAC at ¶¶ 127-133, 139-143.] Limiting the relevant market in an antitrust claim by the defendant's trademark is against legal precedent. As defining the relevant market is a threshold question for an antitrust claim, Heritage's mischaracterization taints the entire antitrust claims. For this reason alone, this Court should dismiss Heritage's antitrust claims in the SAC.

In addition to mischaracterizing the relevant market, Heritage fails to sufficiently plead that Gibson engaged in predatory or anticompetitive actions. As Gibson's interpretation of the 1991 Settlement Agreement is not objectively baseless, this court can decide as a matter of law that Gibson's enforcement actions are immunized by the *Noerr-Pennington* doctrine.[1] Last, as Heritage also does not adequately allege that Gibson's termination of a distributor agreement with a third party constitutes a failure to deal issue or harm to the competitive process. As a result, Heritage's antitrust claims should be dismissed.

---

[1] *See J.M. Smucker Co. v. Hormel Food Corp.*, 526 F.Supp. 294, 309 (N.D. Ohio 2021) ("The issue of whether a lawsuit is objectively baseless is a question of law for the Court and may be decided on a motion to dismiss.").

## II.    LEGAL STANDARD

For purposes of a motion to dismiss, the court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950.

A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990), the court 'need not accept as true legal conclusions or unwarranted factual inferences.'" *Nabi Biopharmaceuticals v. Roxane Lab'ys, Inc.*, No. 2:05-CV-889, 2007 WL 894473, at *2 (S.D. Ohio Mar. 21, 2007) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

## III.    ARGUMENT

Plaintiff's SAC sets forth four additional claims: 1) Monopolization under the Sherman Act, 15 U.S.C. § 2; 2) Attempted Monopolization under the Sherman Act, 15 U.S.C. § 2; 3) Monopolization under Mich. Comp. Laws Ann. § 445.773; and 4) Attempted Monopolization under Mich. Comp. Laws Ann. § 445.773. [*See* SAC at ¶¶ 189-226.] Where a complaint adequately pleads a violation of the Sherman Act, it also adequately pleads a violation of Mich, Comp. Laws Ann. *See*

2

*Northstar Energy LLC v. Encana Corp.*, No. 13-CV-200, 2014 WL 5343423, at *9 (W.D. Mich. Mar. 10, 2014).[2]

"The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion." *Foundation for Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001) (citations omitted).  "While the pleading standard under the federal rules is very liberal . . . .'the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome.'"  *Id.* (internal citations omitted).

To plead monopolization under § 2 of the Sherman Act, the Plaintiff must sufficiently plead two elements: "(1) the possession of monopoly power in a **relevant market**; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to growth or development resulting from a superior product, business acumen, or historic accident."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (internal quotations omitted)(emphasis added).   Similarly, to plead a claim for attempted monopolization under § 2 of the Sherman Act, the Plaintiff must sufficiently allege three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Heritage has not adequately alleged monopoly or attempted monopoly.

---

[2] As MARA is modeled after the Sherman Act, *see Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 326 F. App'x 892, 898 (6th Cir. 2009), federal court interpretations of the Sherman Act are persuasive authority as to the meaning of the MARA.  *See Goldman v. Loubella Extendables*, 283 N.W.2d 695, 699 (Mich. Ct. App. 1979).

## A.     Heritage Improperly Defines the Relevant Market By Making it Exceptionally Narrow and Including Gibson's Trademarks.

"The first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolize, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power." *Conwood*, 290 F.3d at 782.  This Court found that Heritage "defines the 'relevant market' to be '(a) the market for premium solid-body single-cutaway electric guitars (the Premium SBSC Market) . . . and (b) the market for premium semi-hollow, double-cutaway electric guitars (the Premium SHDC Market).'"  [See 12/13/2021 Order, PageID. 1702 citing SAC ¶ 107.]

This definition fails to incorporate the complete definition of the relevant market that the SAC defines beyond paragraph 107.  Heritage's SAC further clarifies the two relevant markets in which Heritage and Gibson compete.  First, Heritage defines the market for Premium SBSC guitars as: "(1) the "iconic" single-cutaway shape with Florentine cutaway of the Les Paul and Heritage H-150, (2) genuine mahogany one piece solid-body with maple top and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22 frets, **and** (7) a 3x3 tuner pin configuration on the headstock."  [SAC at ¶ 124].  Next, Heritage defines the market for Premium SHDC guitars as: "(1) the "iconic" wings formed by the double cutaway and two violin-style f-holes over the hollow chambers of the ES-335 and Heritage H-535, (2) genuine mahogany semi-hollow body with maple block and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22 frets, **and** (7) a 3x3 tuner pin configuration on the headstock."  [SAC at ¶ 136].  Heritage claims that **all** the above extremely narrow and arbitrary details must be present on the guitar for it to fall within the relevant market when assessing an antitrust claim.[3]

---

[3] In its 12/13/2021 Order, this Court only considered the generalized market definition pleaded in SAC ¶ 107.  [See Order at PageID. 1702]  The SAC, however, defines the market for Premium SBSC guitars under ¶ 124 and the market for Premium SHDC guitars under ¶ 136.

Heritage's alledged relevant market is:



Premium SBSC guitar

Premium SHDC guitar

A 3x3 tuner pin

A 3x3 tuner pin

Genuine mohagany one piece solid body with maple top and set neck

Genuine mohagany semi-hollow body with maple block and set neck

24.75" scale length

24.75" scale length

Iconic single-cutaway shape

Iconic wings formed by double-cutaway shape

22 frets

22 frets

2 humbucker pickups

2 humbucker pickups

Nitrocellulose lacquer

Nitrocellulose lacquer

The first flaw with Heritage's relevant market definitions is that Heritage did not provide a sufficient factual predicate to support its exceptionally narrow definition of the relevant markets "The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product." *American Council of Certified Podiatric & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir. 1999).  Heritage expects this Court to find that a reasonable guitar consumer would not switch to a different company's guitar, no matter

the price, because Gibson uses a certain kind of lacquer or has a rectangular head with two rows of three pins instead of a single diagonal row of six pins. [*See* SAC at ¶¶ 127-133, 139-143.]   These unwarranted factual inferences are unreasonable.

"Market definition is a highly fact-based analysis that generally requires discovery." *Foundation for Interior Design Educ. Research v. Savannah College of Art & Design* 244 F.3d 521, 531 (6th Cir. 2001). Despite this, courts in the Sixth Circuit consistently dismiss unreasonable market definitions on a 12(b)(6) motion.   *See Id.* (affirming rejection, on a 12(b)(6) motion, of plaintiff's market definition of accredited interior design programs instead finding non-accredited programs were interchangeable); *Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) ("But the fact that market definition generally requires discovery has not prevented this court, and others, from affirming grants of motions to dismiss on the basis of an insufficiently pled or totally unsupported proposed market."); *National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (affirming dismissal as "Plaintiffs have failed to show that 'there is no cross-elasticity of demand' between the market as narrowly defined and the broader market definition [accepted by the court]").[4]

The second flaw with Heritage's definitions of the two relevant markets are the inclusion of the Gibson trademarks in the relevant market definition.  Two of the Gibson trademarks at issue in this case cover the body shape design of Gibson's Les Paul guitar  (U.S. Reg. No. 1,782,606) and ES-335 guitars (U.S. Reg. No. and 2,007,277).  In its definition sections of the relevant marketplace

---

[4] *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-41 (3d Cir. 1997) (finding the market for a particular brand of pizza ingredient to be too narrowly defined to constitute the relevant market); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (finding the market for TNT channel to be too narrow to constitute a relevant market); *In re German Automotive Manufacturers Antitrust Litigation*, 497 F.Supp.3d 745, 747 (N.D. Cal. 2020) (dismissing class action for failure to define the relevant market finding plaintiffs could not "overcome the commonsense inference that diesel passenger vehicles compete with other passenger vehicles").

in the SAC, Heritage alleges the guitars in the relevant market must have the "iconic' single-cutaway shape with Florentine cutaway of the Les Paul and Heritage H-150" and "the "iconic" wings formed by the double cutaway and two violin-style f-holes over the hollow chambers of the ES-335 and Heritage H-535."  [SAC at ¶¶ 124, 136.]

In other words, to be considered the relevant market, the guitars must display Gibson's valid trademarks.[5]  This error is like what a court in the Sixth Circuit has found resulted in "mischaracteriz[ing] the relevant market."  *Weber v. NFL*, 112 F.Supp. 2d 667, 673 (N.D. Ohio 2000).  In *Weber*, the plaintiff argued that the relevant market should be defined by the demand for the domain names "jets.com" and "dolphins.com."  The *Weber* Court disagreed and instead found that "the market is defined in terms of domain names in general, not "jets.com" and dolphins.com."  *Id.* at 674.  Accordingly, the *Weber* Court dismissed the plaintiff's § 2 of the Sherman Act claim because "the plaintiff has not demonstrated that the football defendants have attempted to control the market, and there is no possibility for monopolization thereof."  *Id.*

Courts in other circuits have also found use of the defendant's trademarks in the definition of the relevant market to be a mischaracterization because "[p]roduct markets are not defined in terms of one trademark or another; trademarks simply identify the origin of the product."  *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999).  The courts consistently dismiss antitrust claims based upon defining trademarks as the relevant market.  *See Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 705 (S.D.N.Y. 1997) ("the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market."); *see also Carell v. Shubert Organization, Inc.*, S.D.N.Y. 2000) ("[T]o define the relevant product market as that group of products over which defendants' anticompetitive conduct

---

[5] This Court has previously found that "Heritage permanently waived the right to challenge the validity of the trademarks contemplated by the agreement" [Opinion, ECF 57 at 14.]

exercises control…as an analytic mater reads the market definition step out of the Sherman Act."); *Frito–Lay, Inc. v. Bachman Co.*, 659 F.Supp. 1129, 1137 (S.D.N.Y. 1986) (finding Frito-Lay corn chips interchangeable with other salty snacks); *Shaw v. Rolex Watch, USA, Inc.*, 673 F.Supp. 674, 679 (S.D.N.Y. 1987) (finding Rolex watches interchangeable with other watches); *Gianna Enterproses v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y. 1982) (finding Miss World and Miss Universe pageants are interchangeable with other beauty pageants); *Belfiore v. The New York Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (rejecting as implausible that a relevant product market could be comprised of the New York Times newspaper as a "general interest daily newspaper directed primarily to upscale readers" because substitutes reasonably included all "general circulation daily newspapers"); *Formula One Licensing, B.V. v. Purple Interactive Ltd.*, No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. 2001) (dismissing case because "[h]ere, by identifying the allegedly relevant product market as 'the market for sales of FIA Formula One Championship-related motor sports goods and services,' Formula 1.com appears to have defined a product market in terms of one or more trademarks.").

Heritage's relevant market definition not only uses Gibson's trademarks as the relevant market but further narrows the relevant market with arbitrary details such as a rectangular head with two rows of three pins instead of a single diagonal row of six pins.  As Heritage's definition of the relevant market is fatally flawed, the antitrust claims in the SAC should be dismissed.

### B.    Heritage Does not Adequately Plead Predatory or Anticompetitive Conduct.

In addition to mischaracterizing the relevant market, Heritage's attempts at pleading Gibson has engaged in predatory and/or anticompetitive conduct are not sufficient to withstand a motion to

dismiss.[6]   Heritage alleges that Gibson engaged in two separate instances of predatory or anticompetitive conduct.   First, Heritage claims that Gibson's policing of its trademarks is objectively baseless and not protected by the Noerr-Pennington doctrine.   Second, Heritage alleges that Gibson's termination of a distribution contract with a company in Southeast Asia that shares a common investor with Heritage is part of an overall anticompetitive scheme against Heritage.

### 1.   Gibson's Trademark Policing Conduct is Protected by the *Noerr-Pennington* Doctrine.

Gibson's trademark enforcement efforts are protected by the *Noerr-Pennington* doctrine. "[P]otential anti-competitive effects [of threatening enforcement of one's valid trademarks] do not transform [a] trademark dispute into an antitrust case, no matter how clever the argument may be." *RJ Mach. Co., Inc. v. Canada Pipeline Accessories Co. Ltd.*, 2013 WL 8115445 (W.D. Tex. 2013). "Courts have found that efforts to protect trademark rights, even those that go as far as bringing suit against a party who has allegedly infringed upon or diluted the trademark owner's rights, represent fair competition, further general trademark policies, and do not constitute violations of antitrust laws." *Weber v. NFL*, 112 F.Supp. 2d at 672-73.  To protect trademark owners against the threat of antitrust suits from policing their trademarks, the courts have applied the *Noerr-Pennington* doctrine.

"The Petition Clause of the First Amendment to the U.S. Constitution provides that private actors have the right to petition the government for action."  *EQMD*, 2021 WL 843145 at *4 (citing U.S. Const. amend. I).  "The Noerr-Pennington doctrine protects individuals from liability in their efforts to pursue their First Amendment free petition rights."  *Id.*  "The essence of the doctrine . . . is that 'parties who petition the government for governmental action favorable to them cannot be

---

[6] The Court need not reach the issues of whether Gibson's actions constitute predatory or anticompetitive intent as Heritage's mischaracterization of the relevant market extinguishes the antitrust claims.

prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Campbell v. PMI Food Equipment Grp., Inc.,* 509 F.3d 776, 790 (6th Cir. 2007).

Generally, steps taken to enforce one's valid trademark will not trigger antitrust liability. "The exercise and enforcement of one's legal [trademark] rights via a threatened lawsuit can hardly be considered a "sham" or in "bad faith." *RJ Mach. Co., Inc. v. Canada Pipeline Accessories Co. Ltd.,* 2013 WL 8115445, at *4 (W.D. Tex. 2013).  "Actions taken to protect trademark rights are privileged, and the defendants who take those actions cannot be held liable for them." *Prakash v. Altadis U.S.A. Inc.,* No. 5:10CV0033, 2012 WL 1109918, at *10 (N.D. Ohio Mar. 30, 2012).  A baseless trademark suit, even if based on a valid trademark, can form the basis of a § 2 claim if brought in a bad faith attempt to expand trademark rights.  *See Scooter Store, Inc. v. SpinLife.com, LLC,* 777 F.Supp. 2d 1102, 1117 (S.D. Ohio 2011).  In *Scooter Store,* the trademark owner improperly attempted to enforce its valid trademark covering insurance claims processing against a competitor's retail business.  *Id.* at 1114.

"Determining whether *Noerr-Pennington* immunity applies does not end the inquiry–next, the court must decide whether the sham exception applies." *EQMD, Inc. v. Farm Bureau General Insurance Company of Michigan,* Case No. 19-13698, 2021 WL 843145, at *5 (E.D. Mich. Mar. 5, 2021).  "The sham exception is a 'narrow one.'" *Westmac, Inc. v. Smith,* 797 F.2d 313, 318 (6th Cir. 1986).  The sham exception "encompasses situations in which persons use the governmental *process*–as opposed to the *outcome* of that process–as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.,* 499 U.S. 365, 380 (1991) (emphasis in original).  "The sham exception turns on whether a *Noerr-Pennington* defendant engaged in objectively baseless activity in order to vex and harass the opposing party." *EQMD,* 2021 WL 843145 at *5 (citing *Rondigo, LLC v. Twp. of Richmond, Mich.,* No. 08-cv-10432, 2012 WL 1021726, at *2 (E.D. Mich. Mar. 27, 2012)).

There is a two-part test to determine if the sham exception applies.  "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 (1993). "[S]ham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief."  *Id.* at 62.  "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail."  *Id.*

If the court finds the suit to be objectively meritless, only then "may a court examine the litigant's subjective motivation."  *Id.*  In determining the second part of the two-part test, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through use of the governmental process–as opposed to the outcome of that process–as an anticompetitive weapon.  *Id.*  "Courts in the Sixth Circuit have routinely dismissed claims under the *Noerr-Pennington* doctrine for failure to adequately plead the sham litigation exception."  *Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-cv-427, 2015 WL 12999664, at *4 (S.D. Ohio Mar. 12, 2015) (collecting cases).

In its Order allowing the SAC, this Court found that Heritage's sixteen pages of its interpretation of the 1991 Settlement Agreement was sufficient to plead that Gibson's suit was objectively baseless.[7]  Due to space limitations, Gibson did not address, however, Heritage's objectively baseless interpretation of the 1991 Settlement Agreement in the opposition to Heritage's motion to file the SAC.  This Court can consider Gibson's interpretation of the 1991 Settlement Ageement in assessing a Motion to Dismiss, as such Gibson will now provide the same.

---

[7] It should be noted that this is a declaratory judgment action initiated by Heritage.  Gibson only counterclaimed for trademark infringement once Heritage filed suit.

This Court can determine whether Gibson's interpretation of the 1991 Settlement Agreement and other trademark enforcement actions, including the infringement counterclaims against Heritage, were objectively baseless in a Motion to Dismiss.  *See Ashley Furniture*, 2015 WL 12999664, at *4 (Unlike the court in *Scooter Store* addressing the subjective intent element of the sham litigation exception, "whether a lawsuit is objectively baseless may be decided as a question of law.")*; see also J.M. Smucker Co. v. Hormel Food Corp.*, 526 F.Supp. 294, 309 (N.D. Ohio 2021) ("The issue of whether a lawsuit is objectively baseless is a question of law for the Court and may be decided on a motion to dismiss.").  To survive Gibson's 12(b)(6) motion, Heritage must plead that Gibson's actions "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Prof'l Real Estate Investors,* 508 U.S. at 60.  "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail."  *Id.*

In reviewing Gibson's Motion to Dismiss, this Court should take into account Gibson's substantive arguments regarding its interpretation of the 1991 Settlement agreement, supra, in deciding whether Gibson's interpretation is objectively baseless.  Heritage's remaining claims regarding Gibson's enforcement of its trademarks are not adequately pleaded.  Paragraphs 80-84 of the SAC attempt to argue that the smokestack on Heritage's factory that bears the name "GIBSON" and Heritages website's reference to Orville Gibson are objectively baseless.  Heritage's website speaks for itself.  Attached as Exhibit E to Gibson's Answer and Counterclaims, [Dkt. No. 61], are screen shots from Heritage's website displaying its infringing products along with the "GIBSON" smokestack and Orville Gibson history.  A a reasonable litigant could interpret these screen shots as an attempt to falsely state or imply that the Heritage products are somehow affiliated, authorized, or licensed by Gibson, resulting in trademark infringement.





As such, Heritage fails to plead the narrow sham litigation exception to *Noerr-Pennington* protection with regards to the "GIBSON" smokestack and Orville Gibson history.

Paragraphs 85-93 of the SAC  claims that "Gibson has a long history of litigiousness, especially when it comes to pursuing rivals with claims of trademark infringement."  [SAC at ¶ 85]. Gibson does not deny that it zealously protects and enforces its valid trademark rights.  However,

13

fervently defending one's valid trademark rights does not support an antitrust claim and certainly is not objectively baseless.  Heritage appears to insinuate that Gibson's use of the term "counterfeit" is misleading and "directly hinders competition by casting a cloud of illegitimacy over entire brands." [SAC at ¶ 90].  To state a claim for trademark counterfeiting under the Lanham Act, a plaintiff must only plausibly plead that: (1) the defendant infringed a registered trademark (15 U.S.C. § 1114) and (2) intentionally used the trademark knowing that it was a counterfeit, as defined in 15 U.S.C. § 1116(d)(1)(B). 15 U.S.C. § 1117(b)(1).  According to the Lanham Act a counterfeit mark is "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods… sold, offered for sale, or distributed and that is in use . . . ." 15 U.S.C. § 1116(d)(1)(B)(i).

The Lanham Act defines a "counterfeit" as "a spurious **mark** which is identical with, or substantially indistinguishable from, a registered mark.  15 U.S.C. § 1127 (emphasis added).  Despite Heritage's claims, branding a guitar with a different name on the headstock does not automatically defeat a counterfeiting claim when the trademark at issue is the body design or headstock design.  As such, Gibson's use of the "counterfeiting" term in its cease and desist letters and look for advertising is not objectively baseless.

The crux of Heritage's claim that Gibson's actions constitute the sham exception is Gibson's interpretation of the 1991 Settlement Agreement.  [*See* SAC at ¶¶ 59-79.]  For Gibson's interpretation of the 1991 Settlement Agreement to be considered objectively baseless, "no reasonable litigant could realistically expect success on the merits."  *Prof'l Real Estate Investors,* 508 U.S. at 60.  This case will ultimately turn on this Court's interpretation of the 1991 Settlement Agreement.  At this point in the litigation, this Court need only find that Gibson's interpretation can realistically expect success on the merits of its interpretation of the 1991 Settlement Agreement.  *See*

*J.M. Smucker Co.,* 526 F.Supp. at 309 ("The issue of whether a lawsuit is objectively baseless is a question of law for the Court and may be decided on a motion to dismiss.").

Despite its fourteen-page attempt at arguing Gibson's interpretation of the 1991 Settlement Agreement is objectively baseless, Heritage only touches upon three sections of the 1991 Settlement Agreement ¶¶ 4, 6 and 7. [SAC at ¶¶ 37-79.]  One only needs to review paragraphs 2, 3, and 4 to see this omission by Heritage is an attempt to avoid the plain language of the 1991 Settlement Agreement.   For Gibson's trademark ownership of the Les Paul and ES-335 body shapes–the Gibson marks at issue in this case–¶ 2(b) states, inter alia, "Gibson also asserts that it owns unregistered trademarks, valid at common law, in the designs and configurations of the following guitars: (1) LES PAUL series (a representative illustration of which is attached as Exhibit A–3); [and] (2) ES "double cutaway" series (a representative illustration of which is attached as Exhibit A–4)…". [*See* Settlement Agreement, Exhibit E to SAC at ¶ 2(b).]  "Heritage agrees that they have waived any right to challenge the asserted validity of the unregistered trademarks and are estopped to do so in the future."  [*Id.*]  Paragraph 3 establishes the Heritage models at issue, "Gibson asserts that Heritage has produced and sold guitars embodying designs or configurations similar to Gibson's trademarks. [*Id.* at ¶ 3.]  "Heritage's guitars (and the corresponding Gibson trademarks) include the following model designations as identified in Heritage's advertising brochure attached hereto as Exhibit B.

| Gibson's Design | Heritage's Models |
|---|---|
| LES PAUL series | H–150 series |
| ES "double cutaway" series | H–535, 555" |

*Id.*

Paragraph 4 states that "Heritage shall discontinue production and sale of the models identified in paragraph 3 except as modified in accordance with this Agreement, and shall not use on or in connection with guitars or like musical instruments any design or configuration similar to any of the

15

following designs of Gibson:  . . . c. LES PAUL series (including Federal Trademark Application Serial No. 675,665 for the body shape portion of a guitar and any federal registration granted on this application); d. ES "double cutaway" series…"  [*Id.* at ¶ 4.]

At this point in the 1991 Settlement Agreement, the language is plain and straight forward– Gibson owns trademarks that Heritage cannot challenge, Heritage was infringing/using those trademarks on guitars, and Heritage shall discontinue production of the guitars embodying those trademarks.  Terms like this are common to trademark settlement agreements and it can hardly be claimed that Heritage's models at issue are not a breach of the 1991 Settlement Agreement, let alone Gibson's claims are objectively baseless.

Paragraph 7 lists the approved modified design features that Gibson allowed Heritage to continue using.    Gibson's theory is that Gibson offered Heritage a few concessions to dismiss the opposition against Gibson's Les Paul Body Shape Design® trademark.  ¶ 7(a) states, "Heritage shall change the design of its production model guitars by changing the following features of the guitars listed below to that depicted in Exhibits C-1 through C-4.

| Modified Design Feature | Heritage's Current Model Designations |
| --- | --- |
| (1) TRUSS ROD COVER<br>Exhibit C–1 | All guitar models |
| (2) PICK GUARD<br>Exhibit C–1 | All H–150 series guitars |
| (3) HORN DIMENSION<br>Exhibit C–1 | All H–150 series guitars |
| (4) PEGHEAD<br>Exhibit C–1 | H–357 |
| (5) Removal of switch washer | H–150CM" |

[*Id.* at ¶ 7(a).]  Paragraph 7(a) further muddies the water by stating, "Gibson agrees that the Heritage production model guitar with all of the modifications set forth above do not violate paragraph 4,

provided however that all other features of the production model guitars are the same as depicted in Exhibit B for the particular production model guitar." *Id.* Further, "[t]he Modified Guitar models approved by this provision shall include only complete designs consisting of the hardware and pegheads depicted in Exhibit B and all modified features identified above." *Id.* The meaning of paragraph 7 has led to this lawsuit.

Under Heritage's interpretation, paragraph 7 completely overrides the plain language of paragraphs 2-4 and allows Heritage to continue using all the Gibson trademarks enumerated in paragraphs  2 as long as one of the modified design features was present on the guitar.  For example, Heritage could continue manufacturing and selling its H-535 models that incorporated Gibson's ES "double cutaway" series mark as long as the modified truss-rod cover, illustrated in Exhibit C–1, was present on the guitar.  [*See* SAC ¶ 38].  This unreasonable interpretation allows Heritage to continue using the majority of the Gibson trademarks complained of in the original suit without recourse by a Gibson challenge?

Under Gibson's interpretation, Heritage is allowed only to use the modified design features enumerated in paragraph 7(a) with impunity.   For example, Heritage would be allowed to manufacturer a H–150 series with the horn dimension shown in Exhibit C–3 as long as the Truss Rod Cover from Exhibit C–1 and Pick Guard from Exhibit C–2 were also present on the guitar. This interpretation gives full weight to the plain language of paragraphs 2-4 and carves out limited exceptions.  This exception also provides more meaning to paragraph 7(b) which states "[a]ny production model guitar manufactured by Heritage which does not comply with the approved designs and is closer in appearance to Gibson's registered and unregistered trademarks shown in Exhibits A–1 through A–7 shall be subject to being challenged by Gibson as a violation of this Agreement."  [1991 Settlement Agreement, ¶ 7(b).]  Under Gibson's interpretation, paragraph 7(b)

17

would cover the instances where Heritage used modified design features that were closer in appearance to the Gibson trademarks than detailed in paragraph 7(a).

In deciding this motion, the Court need not determine whether Heritage's or Gibson's interpretation is correct.  Rather, the Court need only find that Gibson's interpretation can realistically expect success on the merits of its interpretation of the 1991 Settlement Agreement.  *See J.M. Smucker Co.,* 526 F.Supp. at 309 ("The issue of whether a lawsuit is objectively baseless is a question of law for the Court and may be decided on a motion to dismiss.").  "The sham exception is a 'narrow one.'"  *Westmac, Inc. v. Smith*, 797 F.2d 313, 318 (6th Cir. 1986).  Based on the plain language of the 1991 Settlement Agreement, Gibson's interpretation cannot be considered objectively baseless.  As such, Gibson's trademark enforcement actions are protected by *Noerr-Pennington* immunity.[8]

### 2. Gibson's Termination of the Distribution Contract does not Rise to the Level of Predatory or Anticompetitive Conduct.

For its second attempt at a predatory or anticompetitive action, Heritage concocts a conspiracy theory surrounding Gibson's voluntary termination of a distribution license agreement with a Southeast Asian distributor, Swee Lee.

For the sake of argument, even if Heritage sufficiently alleged possession of or a dangerous probability of achieving monopoly power, Gibson's alleged termination of the Swee Lee distribution contract would not qualify as predatory or anticompetitive conduct.  "[R]efusal-to-deal claims face a steep and obstacle laden climb."  *St. Luke's Hospital v. ProMedica Health System, Inc.*, 8 F.4th 479, 486 (6th Cir. 2021).  "As a general rule, businesses are free to choose the parties with whom they will

---

[8] "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 (1993).  "[S]ham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief."  *Id.* at 62.  "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail."  *Id.*

deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Comms., Inc.*, 555 U.S. 438, 448, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009). The Supreme Court has recognized, for over a century, the Sherman Act "does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

The Supreme Court has provided an extremely narrow exception to the freedom to deal right. Under narrow circumstances, "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2 [of the Sherman Act]. *Verizon Comms. Inc. v. Law Offs. Of Curtis Trinko*, 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). This exception requires "a showing that the 'monopolist's conduct' is 'irrational but for its anticompetitive effect.'" *See St. Luke's Hospital*, 8 F.4th at 486 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)*; see also Viamedia, Inc. v. Comcast Corp.*, 951 F3d 429, 462 (7th Cir. 2020) (same). "Because separating 'anticompetitive malice' from 'competitive zeal' tries the most acute and fair-minded judges and because there is a rational explanation for most business conduct, far more claims are lost than won on this ground." *St. Luke's Hospital*, 8 F.4th at 486.

When assessing this narrow exception, the Sixth Circuit asks three questions: (1) "[d]id the monopolist enter a 'voluntary…course of dealing' with its rival?"; (2) "[d]id the monopolist willingly sacrifice 'short-run benefits…in exchange for a perceived long-run impact on its smaller rival'?"; and (3) "[i]f so, did the monopolist ignore efficiency concerns,…or act without 'valid business reasons.'" *Id.* at 486-87. "Answering "no" to any of [these questions] signals that the antitrust laws do not apply." *Id.* at 487. Heritage's SAC alleges that Gibson and Swee Lee had prior dealings under a distribution agreement. [SAC ¶ 96].

The SAC alleges that the relationship with Swee Lee was profitable for Gibson [SAC ¶ 97] but does not allege that Gibson sacrificed any short term benefits.  The SAC does allege that "Gibson's decision to terminate its prior course of dealing with Swee Lee is irrational but for Gibson's anticompetitive motive to drive Heritage from the U.S. market" [SAC ¶ 104] but does not allege that Gibson ignored efficiency concerns by terminating the Swee Lee distribution contract. As two of the three[9] Sixth Circuit questions are "no," antitrust laws do not apply to Gibson's termination of the Swee Lee distribution agreement.

In addition to failing to allege that Gibson's termination of the Swee Lee distribution agreement does not meet the narrow exception to freedom to deal, Heritage also fails to plead how Gibson's termination of the Swee Lee distribution agreement harms the competitive process or harms consumers.  "The focus [of antitrust laws] is guarding the competitive process and on protecting the welfare of consumers, not ensuring the economic fortunes of competitors."  *St. Luke's Hospital*, 8 F.4th at 486.  "A monopolist's actions thus must 'harm the competitive *process* and thereby harm consumers,' as mere 'harm to one or more *competitors* will not suffice.'"  *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (per curiam)).  Heritage does not allege how Gibson's termination of Swee Lee's distribution agreement harms the competitive process.  If anything, Gibson's removal of a trademark infringer will protect the competitive process and the welfare of consumers.  *See Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 163-64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) ("In principle, trademark law, by preventing others from copying a source-identifying mark, 'reduce[s] the customer's costs of shopping and making purchasing decisions,…for it quickly and easily assures a potential customer that *this* item–the item with this

---

[9] As Swee Lee was Gibson's Southeast Asian distributor instead of its rival, it is arguable that all three questions should be answered "no" based on the allegations in the SAC.

mark–is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past.").

### IV.    CONCLUSION.

Heritage fatally mischaracterizes the relevant market in assessing Gibson's monopoly power. Heritage's definition of the relevant market is overly narrow and limited by Gibson's valid trademarks. In addition, Heritage fails to sufficiently plead that Gibson has engaged in predatory or anticompetitive acts by policing its valid trademarks or terminating the distribution agreement with the third party Swee Lee. As such, this Court should dismiss Heritage's antitrust claims [SAC claims VIIX] in their entirety.


Dated: December 23, 2021             BATES & BATES, LLC
                                     Attorneys for Defendant

                                      /s/Andrea E. Bates
                                     Andrea E. Bates
                                     *Pro Hac Vice*
                                     Kurt Schuettinger
                                     *Pro Hac Vice*
                                     Bates & Bates, LLC
                                     1890 Marietta Boulevard NW
                                     Atlanta, Georgia 30318
                                     Telephone: (404) 228-7439
                                     Facsimile: (404) 963-6231
                                     abates@bates-bates.com
                                     kschuettinger@bates-bates.com

                                     Steven Susser
                                     Carlson, Gaskey & Olds, P.C.
                                     400 W Maple Road, Ste 350
                                     Birmingham, MI 48009
                                     (248) 283-0734
                                     ssusser@cgolaw.com

## <u>CERTIFICATE OF COMPLAINCE WITH L.R. 7.3(B)</u>

I hereby certify that the foregoing Brief complies with the limitation of the length of a dispositive motion set forth in L.R. 7.2(b)(i). Specifically, this brief contains 6,224 words (excluding the parts of the brief exempted by the Rule), as determined by the word count feature of the word processing program used to create this brief, Microsoft Word Version 16.41.


Dated: December 23, 2021                          BATES & BATES, LLC
                                                  Attorneys for Defendant

                                                   /s/ *Andrea E. Bates*
                                                  Andrea E. Bates
                                                  *Pro Hac Vice*
                                                  Kurt Schuettinger
                                                  *Pro Hac Vice*
                                                  Bates & Bates, LLC
                                                  1890 Marietta Boulevard NW
                                                  Atlanta, Georgia 30318
                                                  Telephone: (404) 228-7439
                                                  Facsimile: (404) 963-6231
                                                  abates@bates-bates.com
                                                  kschuettinger@bates-bates.com

                                                  Steven Susser
                                                  Carlson, Gaskey & Olds, P.C.
                                                  400 W Maple Road, Ste 350
                                                  Birmingham, MI 48009
                                                  (248) 283-0734
                                                  ssusser@cgolaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2021, the Defendant's Motion to Dismiss was electronically filed the foregoing Certificate of service with the Clerk of Court using the ECF system, which will send notification of such filing to counsel of record.


Dated: December 23, 2020                    BATES & BATES, LLC
                                            Attorneys for Defendant

                                            /s/*Andrea E. Bates*
                                            Andrea E. Bates

23