UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERITAGE GUITAR, INC.,

    Plaintiff,

v.

GIBSON BRANDS, INC.,

    Defendant.

_____/

Case No. 1:20-cv-229

Hon. Hala Y. Jarbou

## **OPINION**

On December 13, 2021, the Court granted Plaintiff Heritage Guitar, Inc.'s motion for leave to file a second amended complaint ("SAC"). (ECF Nos. 101, 102.) The SAC added four additional claims: (1) monopolization in violation of 15 U.S.C. § 2; (2) attempted monopolization in violation of 15 U.S.C. § 2; (3) monopolization in violation of Mich. Comp. Laws § 445.773; and (4) attempted monopolization in violation of Mich. Comp. Laws § 445.773. (ECF No. 104.) Before the Court is Defendant Gibson Brands, Inc.'s partial motion to dismiss the SAC, specifically, the four additional antitrust claims. (ECF No. 105.) For the reasons stated below, the Court will deny Gibson's motion.

### **I. BACKGROUND**

The facts of the case are summarized in the Court's December 13, 2021 opinion. (*See* 12/13/2021 Op., ECF No. 101.) Briefly, Heritage filed a declaratory judgment action in this Court in response to several cease-and-desist letters from Gibson that were sent between 2015 to 2020. Gibson claimed in the cease-and-desist letters that Heritage guitars infringed the Les Paul and ES Body shapes, which Gibson owns the trademarks for, in violation of a settlement agreement that the parties entered into in 1991. The 1991 Settlement Agreement had allowed Heritage to continue making its guitars as long as it made specific changes to its models and permitted Heritage a

reasonable degree of design freedom for future changes, so long as the changes were not "closer in appearance to Gibson's registered and unregistered trademarks." (1991 Settlement Agreement, ECF No. 22, PageID.133.)  Heritage is seeking a declaratory judgment that it has complied with the Settlement Agreement and therefore, has not infringed on Gibson's trademarks.

Also, in May 2021, Gibson allegedly terminated a profitable contract with Swee Lee, a Singaporean musical instrument and equipment distribution and retail platform, without cause. Swee Lee is a sister company to Heritage as they share a part owner, BandLab Technologies. Heritage alleges that Gibson is targeting Swee Lee in order to punish BandLab Technologies, Heritage's investor, to pressure Heritage out of the market.  Gibson's cease-and-desist letters combined with this conduct toward Swee Lee forms the basis of Heritage's antitrust claims against Gibson.

## II. STANDARD

To determine whether a pleading fails to state a claim, courts must ask whether the plaintiff has alleged "facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level,' and . . . 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausible does not mean probable, but the standard "asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a plaintiff pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, courts must accept factual allegations as true, but will reject conclusory statements as "not entitled to the assumption of truth." *Id.* (citing *Twombly*, 550 U.S. at 555-56). Hence, courts will ignore conclusory assertions and, accepting well-pled factual allegations as true, determine whether the allegations "plausibly give rise to an entitlement to relief." *Id.* Determining the plausibility of a claim is a "context-specific" inquiry, "requiring the reviewing court to draw on its experience and common sense." *Id.* If the Court decides that there is no plausible claim to relief, then the plaintiff has failed to state a claim.

## III. ANALYSIS

### A. Law of the Case

The motion to amend standard, which the Court applied in its December 13, 2021 Opinion, includes a futility prong that uses the same analysis as for a motion to dismiss. *See Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) (Futility exists where "the pleading as amended could not withstand a motion to dismiss.") (internal quotations marks omitted). Therefore, the Court has previously addressed Gibson's arguments that Heritage should not be permitted to amend because the additional claims would not survive the Rule 12(b)(6) standard. The Court found Heritage's claims plausible. Now, Gibson brings a motion to dismiss the claims that the Court found plausible and raises new arguments based on the same issues.

Heritage argues that the Court should apply the "law of the case" doctrine since the Court has addressed the same issues in its previous opinion. *See* 18B Wright & Miller, Federal Practice & Procedure Jurisprudence § 4478 (3d ed. 2021) ("Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."). "The doctrine applies only to issues that were actually decided, whether explicitly or by necessary implication. . . . 'Importantly, however, [the law-of-the-case] doctrine is intended to enforce a district court's adherence to an appellate court's judgment, and

3

so is applied only loosely when we reconsider our own decisions.'" *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) (quoting *Miller v. Maddox*, 866 F.3d 386, 390 (6th Cir. 2017)); *see also McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 n.3 (6th Cir. 2000) (noting that the "'law of the case' doctrine is 'directed to a court's common sense' and is not an 'inexorable command'").

While other courts may have applied the law of the case doctrine to similar situations, that is, a motion to dismiss after a futility determination, *see e.g. Teoba v. TruGreen Landcare LLC*, No. 10-CV-6132 CJS, 2013 WL 1560208 (W.D.N.Y. Apr. 10, 2013), this Court in its discretion will address Gibson's motion on the merits. In any case, the result is the same.

**B. Relevant Market**

To bring a claim under § 2 of the Sherman Act, a plaintiff must sufficiently allege two elements: "(1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012) (citing *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 613 (6th Cir. 1993)). The SAC identifies two relevant markets in which Gibson and Heritage compete. Gibson raises two new arguments against Heritage's definition of these markets.

**1. Narrow Market Definition**

First, Gibson argues that the definition is improperly narrow. In the Court's previous Opinion, the Court examined the broader definition of the relevant markets included in the SAC (SAC ¶ 107), because Gibson had pointed to that definition in order to argue that Heritage was attempting to relitigate a settled issue. (*See* 12/13/2021 Op., PageID.1701-03.) Now, Gibson points to the more specific definitions (SAC ¶¶ 124, 136) to argue that those are too narrow. As

4

defined in the SAC, the relevant market for premium solid-body single-cutaway electric guitars ("Premium SBSC guitar") includes,

> (1) the "iconic" single-cutaway shape with Florentine cutaway of the Les Paul and Heritage H-150, (2) genuine mahogany one piece solid-body with maple top and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22 frets, and (7) a 3x3 tuner pin configuration on the headstock.  These features provide the look and sound distinctive in the Premium SBSC guitar.

(SAC ¶ 124.)   The relevant market for premium semi-hollow double-cutaway electric guitars ("Premium SHDC guitar") includes,

> (1) the iconic wings formed by the double cutaway and two violin-style f-holes over the hollow chambers of the ES-335 and Heritage H-535, (2) genuine mahogany semi-hollow body with maple block and set-neck, (3) two humbucker pickups, (4) nitrocellulose lacquer, (5) 24.75" scale length, (6) 22 43 frets, and (7) a 3x3 tuner pin configuration on the headstock.  These features provide the look and sound distinctive in the Premium SHDC guitar.

(SAC ¶ 136).  Gibson argues that Heritage has failed to provide a sufficient factual predicate[1] for these definitions, and that all these details are arbitrary.

"A relevant market consists of both a geographic component and a product component." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009).  Well-defined submarkets may exist in a broader market and constitute product markets themselves for antitrust purposes.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). (citing *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593-95 (1957)).   The boundaries of a submarket "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity

---

[1] This language has been used specifically in reference to allegations of market power.  *See, e.g.*, *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 946; *SFX React-Operating*, 2017 WL 3616562, at *9.  It is unclear whether this is a different standard from the *Twombly* plausibility standard.  Because it is unclear if it is a different standard, the Court declines to apply it.

to price changes, and specialized vendors." *Id.* Courts in the Sixth Circuit have found the "'reasonable interchangeability' standard to be '[t]he essential test for ascertaining the relevant product market.'" *Ky. Speedway*, 588 F.3d at 917 (quoting *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983)). "'Reasonable interchangeability' is assessed by considering (1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as 'cross-elasticity'), defined as 'consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.'" *Id.* (quoting *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004)).

"'Market definition is a highly fact-based analysis that generally requires discovery.'" *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) (quoting *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001)). "But the fact that market definition generally requires discovery has not prevented this court, and others, from affirming grants of motions to dismiss on the basis of an insufficiently pled or totally supportable proposed market." *Id.* "Relevant product or geographic markets are sufficiently alleged as long as the allegations in the complaint bear a 'rational relation to the methodology courts prescribe to define a market'"—that is, analysis of the interchangeability of use or the cross-elasticity of demand. *SFX React-Operating LLC v. Eagle Theater Ent., LLC*, No. 16-13311, 2017 WL 3616562, at *9 (E.D. Mich. Aug. 23, 2017) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 946 (E.D. Tenn. 2008) (citing *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 470 (6th Cir. 2005)).

Accepting the factual allegations as true, the Court finds that the SAC plausibly alleges the relevant markets. The SAC plausibly alleges "practical indicia," i.e., how the characteristics

of both the Premium SBSC guitars and the Premium SHDC guitars are unique and not reasonably interchangeable with other products. For example, the SAC explains:

> Distinctive body shapes . . . are associated with particular guitarists, genres, and eras of music. There is nostalgia and prestige attached to the body shape of these guitars. . . .
>
> The body shape of the guitar also affects the playability of the instrument: how easy it is to sit and stand with, and the fret access. Experienced musicians are familiar with these subtle differences between guitar body shapes and would not consider other body shapes interchangeable for body shapes of guitars in the Premium SBSC Market and Premium SHDC Market.
>
> Sound is a critical concern for musicians. . . . For example, Premium SBSC guitars have a heavier sound of music than the Fender Telecaster (another high-selling single-cutaway electric guitar) in part because of the type of wood used in their construction. Premium SBSC and Premium SHDC guitars are made using genuine mahogany. Fender guitars are typically made using ash or alder wood, which has a thinner tonality associated with it.

(SAC ¶¶ 111, 112, 114.) In this way, the SAC alleges how each characteristic included in the definition is unique to the submarket. (*See also* SAC ¶¶ 114-21 (describing the other included characteristics).) Gibson does not address these allegations in its argument.

The cases that Gibson cites are not comparable. For example, in *Michigan Division Monument Builders*, the court noted that "Plaintiffs' complaint contains no allegations whatsoever relating to the rule of interchangeability or to substitute products." 458 F. Supp. 2d at 483. That is not the case here.

### 2. Inclusion of Trademarks

Second, Gibson argues that the claims should be dismissed because the definitions of the relevant markets improperly include Gibson's trademarks. Gibson points to various cases where courts have dismissed antitrust claims when the relevant markets were defined in the terms of one trademark or brand. *See, e.g.*, *Weber v. Nat'l Football League*, 112 F. Supp. 2d 667, 674 (N.D. Ohio 2000) ("[T]he market is defined in terms of domain names in general, not 'jets.com' and

7

'dolphins.com.'"); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 679 (S.D.N.Y. 1987) (finding that Rolex watches are not a relevant product market in itself because they are reasonably interchangeable with other high quality timepieces); *Formula One Licensing v. Purple Interactive*, No. C 00-2222 MMC, 2001 WL 34792530, at *3 (N.D. Cal. Feb. 6, 2001) (finding that the suggested definition of the relevant market, "the market for sales of FIA Formula One Championship-related motor sport goods and services" to be defined in terms of a trademark, and therefore inappropriate). These cases illustrate the premise that a product market cannot be defined by a brand or trademark in itself. *See Weber*, 112 F. Supp. 2d at 674 ("'Product markets are not defined in terms of one trademark or another; trademarks simply identify the origin of a product. [It cannot be argued] that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets.'") (quoting *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999); *see also Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 ("'[T]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.'") (quoting *Deep S. Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, No. 88 CIV. 6243, 1989 WL 48400, at *5 (S.D.N.Y May 2, 1989).

The first factor in the Premium SBSC guitars market requires "the 'iconic' single-cutaway shape with Florentine cutaway of the Les Paul and Heritage H-150," and the first factor in the Premium SHDC guitars market requires "the iconic wings formed by the double cutaway and two violin-style f-holes over the hollow chambers of the ES-335 and Heritage H-535." (SAC ¶¶ 124, 136.) While Heritage's definitions of the relevant markets are rather narrow, the markets are not defined by Gibson's trademarks. The markets are defined broadly enough to encompass both Gibson's and Heritage's guitars and is not limited to only Gibson's trademarks.

The inclusion of Gibson's trademarks in its definition (as long as it is not solely limited to the trademarks) is not inherently problematic because any relevant market would necessarily include Gibson's guitars if it were a market in which Gibson and Heritage compete. Whether other guitars are included in these markets or whether the definition should be broadened to include other guitars need not be determined on the pleadings. At this stage, Heritage has plausibly alleged the borders of its proposed relevant markets.

### C. *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine protects private actors from antitrust liability when exercising their First Amendment right to petition the government for redress. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *Mine Workers v. Pennington*, 381 U.S. 657 (1965). *Noerr-Pennington* immunity extends to pre-litigation activities, such as cease-and-desist letters, filing court documents, and other legal proceedings. *See VIBO Corp. v. Conway*, 669 F.3d 675, 684 (6th Cir. 2012); *J.M. Smucker Co. v. Hormel Food Corp.*, 526 F. Supp. 3d 294, 308 (N.D. Ohio 2021). Thus, an owner of a trademark has the right to protect its property through litigation without exposing itself to antitrust liability. *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1114 (S.D. Ohio 2011) (citing *Cal. Motor Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

A narrow exception to this doctrine exists where the lawsuits are a "sham" and filed for the purpose of interfering with competition. *Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-cv-427, 2015 WL 12999664, at *4 (S.D. Ohio Mar. 12, 2015) (citing *Static Control Components*, 697 F.3d at 408). For litigation to be a sham, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Pro. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 50 (1993). "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective

9

motivation." *Id.* "As long as there is an 'objectively reasonable' basis to litigate, a lawsuit or prelitigation activities 'cannot be a sham regardless of subjective intent.'" *J.M Smucker Co.*, 526 F. Supp. 3d at 308 (quoting *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, No. 1:15-CV-737, 2016 WL 3999315, at *4 (S.D. Ohio July 26, 2016).

The Court has previously ruled on *Noerr-Pennington* immunity. (*See* 12/13/2021 Op., PageID.1703-05.) Gibson had argued that "Heritage cannot plead sufficient factual matter that allows this Court to infer that under Gibson's interpretation, no reasonable litigant could realistically expect success on the merits." (Def.'s Br. in Opp'n to Heritage's Mot. for Leave to File a 2d Am. Compl., ECF No. 91, PageID.1635.) Yet, Gibson had not provided its interpretation of the Settlement Agreement, nor explained why the Court must accept its interpretation. Therefore, the Court found that despite Gibson's arguments, the SAC plausibly alleged that Gibson's claims are objectively baseless. (12/13/2021 Op., PageID.1703-05.) Now, Gibson provides its interpretation in this motion.

The Court may decide the issue of whether a lawsuit or pre-litigation activity is objectively baseless on a motion to dismiss. *J.M. Smucker Co.*, 526 F. Supp. 3d at 308. This issue is a question of law for the Court to decide, as "there is no dispute over the predicate facts of the underlying legal proceeding." *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 50 (1993).

First, Gibson points to Heritage's references to Orville Gibson on its website, and Heritage's use of a photo that depicts a factory with a smokestack that bears the word "GIBSON" on it. Gibson argues that a reasonable litigant could realistically expect success on a trademark infringement claim based on the photo and reference. The SAC clarifies that the reference to Orville Gibson makes clear that after his departure in 1984, former employers purchased space at

the factory to create Heritage. (SAC ¶ 83.) Accepting Heritage's allegations as true, no reasonable litigant could realistically expect success on the merits of a claim that Heritage sought to imply a current affiliation through reference to its history with Orville Gibson. As to the photo with the smokestack, Heritage alleges in the SAC that it rents the factory to produce its guitars, and therefore, has no control over the appearance of the building or the smokestack. (SAC ¶81.) However, Gibson owns the trademark for its name. (ECF No. 61-1, PageID.1025.) The inclusion of the photo on Heritage's website with the Gibson name clearly visible may provide a basis for a weak, but not objectively baseless trademark infringement claim.

Next, Gibson supplies the Court with its interpretation of the 1991 Settlement Agreement to justify its counterclaims and pre-litigation activities based on the guitar trademarks. Gibson's counterclaims allege that Heritage guitars infringe on its trademarks for the Les Paul and ES body shapes in violation of the Settlement Agreement. If Gibson can show that Heritage violated the terms of the Settlement Agreement (and therefore, infringed on Gibson's marks) such that a reasonable litigant could realistically expect success on the claims, then Gibson is entitled to *Noerr-Pennington* immunity. However, neither Gibson's allegations in its counterclaims, nor the arguments in its briefing provide a basis for this Court to find that Gibson's claims are not objectively baseless.

The relevant portions of the Settlement Agreement are reproduced below:

3. Gibson asserts that Heritage has produced and sold guitars embodying designs or configurations similar to Gibson's trademarks. Heritage's guitars (and the corresponding Gibson trademarks) include the following model designations as identified in Heritage's advertising brochure attached hereto as Exhibit B.

| Gibson's Design | Heritage's Models |
| --- | --- |
| LES PAUL series | H-150 series |
| ES "double cutaway" series | H-535, 555 |

11

| | |
|---|---|
| ES "single cutaway" series | H-575, 576 |
| L5 series | Super Eagle, Eagle TDC |
| Firebird/Thunderbird series | H-357 |
| Bell-Shaped Truss Rod Cover | All guitar models |

4. Heritage shall discontinue production and sale of the models identified in paragraph 3 except as modified in accordance with this agreement, and shall not use on or in connection with guitars or like musical instruments any design or configuration substantially or confusingly similar to any of the following designs of Gibson:

    a. Federal Registration No. 1,020,485 for DOVE WING PEGHEAD

    b. Federal Registration No. 1,022,637 for BELL-SHAPED TRUSS ROD COVER;

    c. LES PAUL series (including Federal Trademark Application Serial No. 675,665 for the body portion of a guitar and any federal registration granted on this application);

    d. ES "double cutaway" series;

    e. ES "single cutaway" series;

    f. L5 series; and

    g. FIREBIRD/THUNDERBIRD series.

5. Notwithstanding paragraph 4, Heritage shall be allowed to dispose of existing inventory of Affected Guitars to the extent permitted below.

6. Any modification of Heritage's guitars and stringed instruments (including mandolins and banjos) expressly permitted below shall not be deemed to be violation of paragraph 4. Gibson agrees that it will not commence any legal action or proceeding asserting that the Modified guitars violate any of Gibson's trademarks.

7.     a. Heritage shall change the design of its production model guitars by changing the following features of the guitars listed below to that depicted in Exhibits C-1 through C-4.

| Modified Design Feature | Heritage's Current Model Designations |
|---|---|
| TRUSS ROD COVER | All guitar models |

Exhibit C-1

PICK GUARD                              All H-150 series guitars
Exhibit C-2

HORN DIMENSION                          All H-150 series guitars
Exhibit C-3

PEGHEAD                                 H-357
Exhibit C-4

Removal of switch washer                H-150CM

> Gibson agrees that the Heritage production model guitar with all of the modifications set forth above do not violate paragraph 4, provided however that all of the other features of the production model guitars are the same as depicted in Exhibit B for the particular production model guitar. The Modified Guitar models approved by this provision shall include only complete designs consisting of the hardware and pegheads depicted in Exhibit B and all modified features identified above. . . .
>
> b.      Any production model guitar manufactured by Heritage which does not comply with the approved designs and is closer in appearance to Gibson's registered and unregistered trademarks shown in Exhibits A-1 through A-7 shall be subject to being challenged by Gibson as a violation of this Agreement. Furthermore, any production model guitar manufactured by Heritage which violates paragraph 4 or any individual custom order guitar manufactured by Heritage which violates paragraph 8 shall be subject to being challenged by Gibson as a violation of this Agreement.

(1991 Settlement Agreement ¶¶ 3-7, ECF No.111-1.)

It is not disputed that Gibson owns the Les Paul and ES body shape trademarks. The Court held in its March 10, 2021 Opinion that Heritage permanently waived the right to challenge the validity of these trademarks as per the Settlement Agreement. (*See* 3/10/2021 Op. 14, ECF No. 57.) But just as Heritage waived this right in the Settlement Agreement, the Settlement Agreement includes rights that Gibson has waived as well. Paragraphs 3 lists the Heritage models that Gibson asserts are similar to Gibson trademarked designs. Paragraph 4 states that "Heritage shall discontinue production and sale of the models identified in paragraph 3 *except as modified in*

13

*accordance with this Agreement. . . .*" (1991 Settlement Agreement ¶ 4 (emphasis added).)

Paragraph 6 clearly states the right that Gibson has waived through this Settlement Agreement:

> Any modification of Heritage's guitars and stringed instruments . . . expressly permitted below shall not be deemed to be in violation of paragraph 4. Gibson agrees that it will not commence any legal action or proceeding asserting that the Modified Guitars violate any of Gibson's trademarks.

(*Id.* ¶ 6.) Thus, as long as Heritage guitars are modified according to the Settlement Agreement as described in paragraph 7, Gibson cannot sue for trademark infringement. Paragraph 7 also reiterates this waiver:

> Gibson agrees that the Heritage production model guitar with all of the modifications set forth above do not violate paragraph 4, provided however that all other features of the production model guitars are the same as depicted in Exhibit B for the particular production model guitar.

(*Id.* ¶ 7.) Production model guitars are defined as "the standard line of guitars and stringed instruments manufactured and/or offered for sale by Heritage and shall include *all guitars and stringed instruments* depicted or described in any Heritage brochures or advertising." (*Id.* ¶1c (emphasis added).)

Gibson's interpretation of the Settlement Agreement is that "Heritage is allowed only to use the modified design features enumerated in paragraph 7(a) with impunity." Gibson does not fully articulate what this means except to provide an example:

> Heritage would be allowed to manufacture[] a H-150 series with the horn dimension shown in Exhibit C-3 as long as the Truss Rod Cover from Exhibit C-1 and Pick Guard from Exhibit C-2 were also present on the guitar.

(Def.'s Br. in Support of Def.'s Partial Mot. to Dismiss, ECF No. 106, PageID.1806.) However, if Heritage were to "continue manufacturing and selling its H-535 models that incorporated Gibson's ES 'double cutaway' series mark as long as the modified truss-rod cover, illustrated in Exhibit C-1, was present on the guitar," by Gibson's interpretation, this would be unreasonable. (*Id.*) Gibson does not explain why this would be an unreasonable interpretation, providing only a

14

rhetorical question: "This unreasonable interpretation allows Heritage to continue using the majority of the Gibson trademarks complained of in the original suit without recourse by a Gibson challenge?" (*Id.*)  In fact, the plain language of the Settlement Agreement provides the answer to this question as "yes" (with the caveat that the Heritage guitars are modified in accordance with paragraph 7(a) and any changes do not bring the guitars closer in appearance to Gibson trademarks).

Paragraph 3 clearly lists all of Heritage's models that Gibson believed infringed on its designs, including the H-535 model.  Nevertheless, paragraphs 4, 6, and 7 allow the continued production of Heritage guitars as long as they are modified in accordance with the Agreement.  These modifications are listed in paragraph 7(a).  The only modifications required for an H-535 model would be to modify the truss-rod cover, as that is a required modification for "all guitar models." (1991 Settlement Agreement ¶ 7.)  There are no other required modifications for the H-535 model.

Except to declare this an "unreasonable interpretation," Gibson has provided no reason for the Court to reject the plain language of the Settlement Agreement.  Gibson argues that its interpretation "gives full weight to the plain language of paragraphs 2-4" and "more meaning to paragraph 7(b)." (Def.'s Br. in Support of Def.'s Partial Mot. to Dismiss, PageID.1806.)  In fact, Gibson's interpretation is at odds with the plain language of the Agreement and would render meaningless portions of paragraphs 4, 6, and 7, as described above.  Other than colorfully characterizing Heritage's arguments, Gibson does not explain why the Heritage guitars that Gibson is now claiming violates the Settlement Agreement and infringes on the Les Paul and ES body shape trademarks are not included in the definition of "production model guitars," that is, "all guitars and stringed instruments depicted or described in any Heritage brochures or advertising."

(*See* Def.'s Reply Br., ECF No. 115, PageID.1945; 1991 Settlement Agreement ¶ 7a, 1c.) Based on the plain language of the agreement, Gibson's interpretation is objectively baseless.

Gibson provides no other arguments in its briefing for why its counterclaims are not objectively baseless. There is no dispute about the contents of the Settlement Agreement, which comprise the predicate facts. Therefore, the Court finds, as a matter of law, that Gibson's counterclaims and pre-litigation conduct relating to its Les Paul and ES body shape trademarks are objectively baseless for the purpose of the sham litigation exception to the *Noerr-Pennington* doctrine.

Based on the analysis above, all but one of Gibson's counterclaims and pre-litigation conduct are objectively baseless. Objectively baseless claims dominate Gibson's counterclaims and pre-litigation conduct. *See Intel Corp. v. Via Technologies, Inc.*, No. C 99-03062 WHA, 2001 WL 777085, at *6 (N.D. Cal. Mar. 20, 2001) ("Discovery may reveal that the incremental effects of the supposed sham components were negligible or may show that they dominated the original complaint. Discovery may shed light on the actual factual pattern in need of a rule. While ultimately the Court may (or may not) agree with Intel's sweeping categorical rule of immunity, it should not do so at the pleading stage."). Therefore, the Court will follow the decisions of other courts that have dealt with "mixed" claims scenario and deny Gibson *Noerr-Pennington* immunity. *See In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 266 (E.D. Pa. 2010); *In re Wellbrutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 156 n. 34 (3d Cir. 2017) ("When considering whether a petition is entitled to immunity, courts should consider whether the petition as a whole is objectively baseless.").

### D. Swee Lee Termination

The Court found in its December 13, 2021 opinion that Heritage plausibly alleged that Gibson's conduct involving Swee Lee would be actionable under the Sherman Act. Now Gibson

16

raises new arguments that this conduct does not qualify as predatory or anticompetitive conduct on its own. Gibson points to the Sixth Circuit's standard for assessing "refusal to deal" claims. *See St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486-87 (6th Cir. 2021). The test looks to whether there was (1) a prior voluntary course of dealing, (2) a sacrifice of short-term benefits "in exchange for a perceived long-run impact" on its rival, and (3) no valid business justification or disregard of "efficiency concerns." *Id.* (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 611 (1985)). Gibson argues that the SAC fails to allege the last two factors.

The Court finds that, after a reexamination of the SAC, Heritage plausibly alleges a refusal-to-deal claim as it relates to Gibson's conduct involving Swee Lee.[2] The SAC alleges that Swee Lee's sale of Gibson products was increasingly profitable. (SAC ¶ 97.) However, despite a recommendation from its representative in Asia, Gibson declined Swee Lee's proposal to distribute its products in four Southeast Asian markets. (*Id.* ¶ 101.) It also rejected Swee Lee's request to "at least sell [Gibson's] amplifiers to them at higher dealer prices (instead of more favorable distributor pricing) to meet confirmed pre-orders from customers." (*Id.*) "Gibson's representative in Asia confirmed to Swee Lee that the decision by Gibson management was not based on Swee Lee's capabilities or past performance." (*Id.* ¶ 100.) The SAC also states,

> The decision by Gibson management—contrary to the recommendation of its regional representatives—made no economic sense other than as a means to advance its anticompetitive scheme to monopolize the relevant markets.

---

[2] The Supreme Court's guidance in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), suggests that a separate analysis into Gibson's conduct involving Swee Lee is not necessary if Heritage has otherwise pled an antitrust claim against Gibson. *Id.* at 699 ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (internal citation omitted). The Court will nevertheless address Gibson's argument as Heritage has adequately pled antitrust conduct involving Swee Lee.

17

> . . . .
>
> On May 24, 2021, Gibson doubled down. It provided notice of termination of Swee Lee's entire rights to distribute Gibson products, acknowledging that it was terminating "without cause," and providing the 60-days' notice of termination required by the 2019 Distribution Agreement. The termination will bring to an end the long-standing prior profitable course of dealing between Gibson and Swee Lee. As evidenced by its irrational decision not to set up distribution for Mesa/Boogie [amplifiers] at all in Singapore and Vietnam, the broader termination of Swee Lee as distributor for Gibson guitars and other equipment makes no economic sense. Gibson stands to lose significant revenue, especially in sales in Singapore.

(*Id.* ¶¶ 101-02.) These allegations satisfy the plausibility standard for the second and third prongs.

Last, Gibson argues that Heritage fails to plead how Gibson's termination of the Swee Lee distribution agreement harms the competitive process or harms consumers. The Court has already found that Heritage plausibly alleges that this conduct was "designed to punish [Bandlab Technologies], the common investor, so that it will pull Heritage from the relevant markets in the United States." (12/13/2021 Op., PageID.1706.)

### IV. CONCLUSION

For the reasons stated, the Court will deny Gibson's partial motion to dismiss the second amended complaint. An order will enter in accordance with this Opinion.

Dated:  June 6, 2022                              /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  UNITED STATES DISTRICT JUDGE